THIRD DIVISION

May 5, 1999

(
NUNC
 
PRO
 
TUNC
 AS OF MARCH 31, 1999)

No. 1--96--2922

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

v. )

)

PHILLIP C. RANSTROM, ) Honorable

) Bertina Lampkin,

Defendant-Appellant. ) Judge Presiding.

MODIFIED UPON DENIAL OF REHEARING

JUSTICE BURKE delivered the opinion of the court:

Following a jury trial, defendant Phillip Ranstrom was convicted of attempted murder, armed robbery, home invasion, residential burglary, aggravated battery, and aggravated stalking and was sentenced to 20 years' imprisonment for attempted murder, armed robbery, and home invasion, 15 years for residential burglary, and 5 years for aggravated battery and aggravated stalking, the sentences to run concurrently.  On appeal, defendant contends that:  (1) his alleged admissions to his therapist were improperly disclosed and erroneously admitted at trial; (2) he was denied a fair trial because he was subjected to a mini-trial on other crimes by the State; (3) he was denied his constitutional right to confront witnesses against him because his defense counsel was prohibited from exposing biases and a motive to lie on the part of his therapist; and (4) his conviction for residential burglary must be reversed because the State failed to prove beyond a reasonable doubt that he entered the victim's apartment with the intent to commit a theft.  For the reasons set forth below, we affirm.

On June 8, 1994, Brian Page was attacked in his apartment by an intruder.  Defendant was subsequently arrested on October 28, 1994, and keys to Leann Murphy's apartment were recovered from him.  Thereafter, defendant was charged by indictment with attempted first degree murder, armed robbery, home invasion, residential burglary, aggravated battery, and aggravated stalking.

Prior to trial, defendant's counsel filed a motion 
in
 
limine
 to preclude the testimony of Alan Jacobs, defendant's therapist.  Defendant's counsel argued that because Jacobs held himself out as a therapist and defendant reasonably believed that Jacobs was a therapist, the psychotherapist-patient privilege of confidentiality under the Mental Health and Developmental Disabilities Confidentiality Act ((Confidentiality Act) 740 ILCS 110/1 
et
 
seq
. (West 1996)) precluded Jacobs from testifying, since his communications to Jacobs "simply constituted admissions to past conduct" protected under the Act.

In response, the State argued that because Jacobs believed that Page and Murphy were in imminent danger of being harmed and possibly murdered, the exception to nondisclosure provided in section 11 of the Confidentiality Act was applicable to allow Jacobs to testify and disclose the information communicated to him by defendant.

At the hearing on defendant's motion, defendant's counsel suggested to the trial court that an evidentiary hearing be held to examine Jacobs' notes, that were subpoenaed pursuant to discovery, to determine whether a clear or imminent risk of injury or death existed that would have allowed Jacobs to warn Murphy and Page pursuant to section 11 of the Confidentiality Act.  740 ILCS 110/11 (West 1996).  At a subsequent hearing, defendant's counsel stated that he was in agreement with the State that if Jacobs reasonably believed there was some type of imminent harm to Murphy and Page, the psychotherapist-patient privilege ceases to exist.  Defendant's counsel argued, however, that there was no fear of imminent harm based on a transcript and tape recording from Jacobs' discussion with the police and on Jacobs' notes that he took during his sessions with defendant.

On September 14, 1995, the trial court denied defendant's motion to preclude Jacobs' testimony.  The court stated that it had reviewed Jacobs' notes and a transcript of a tape recording Jacobs made when he went to the police, and determined that "based on what [Jacobs] had over the course of his conversations with [defendant] was more than a reasonable belief that [defendant] was going to hurt someone."  The trial court then read portions from Jacobs' notes and stated, "Good faith is the standard, if he reasonably believes this man is threatening he would be a fool after hearing this not to reasonably believe he was a threat to [Murphy] and especially to [Page]."  Thereafter, defendant filed a motion to reconsider the court's decision, arguing that there was no evidence in Jacobs' notes that defendant made any threat against Murphy and Page or another person that would permit Jacobs to violate the confidential psychotherapist-patient privilege.  The trial court denied the motion.

The State also filed a motion to introduce "other crimes" evidence at defendant's trial, specifically evidence of defendant stalking Murphy and violating an order of protection Murphy had issued against defendant that resulted in defendant subsequently being charged with the aggravated stalking of Murphy.  The State argued that the evidence was probative of defendant's motive or intent to murder Page.  Defendant's counsel moved to preclude the State from introducing evidence that defendant had also been charged with the stalking of Murphy, arguing that the evidence would be prejudicial.  Counsel argued that since the trial court denied the State's motion to consolidate the two cases and ruled that the aggravated stalking case of Murphy was separate enough from the case involving Page, the offense of aggravated stalking of Murphy was not relevant to any incident of any facts before the trial court in the case.  The trial court ruled that the State could use the fact that defendant was arrested and charged for the offense against Murphy.   In granting the State's motion, the trial court ruled that the evidence was admissible because "the probative value certainly outweighs the prejudicial value" and the evidence showed that defendant had a motive to attack Page because defendant was "obsessed" with Murphy.

At defendant's jury trial in February 1996, Brian Page testified that he worked as a registrar in the emergency room at the Ravenswood Hospital and had a private telephone number.  On June 8, 1994, he and Murphy planned to meet at Facets Cinema to see a movie, where Murphy worked as a volunteer.  Page drove to the cinema and, while parking his car, saw defendant, whom he recognized from a photograph Murphy had previously shown him, sitting in a Walgreen's parking lot in a brown Saab across the street from the cinema where Page was to meet Murphy.  After the movie, Page and Murphy decided to get a drink in Murphy's neighborhood, but before doing so, Murphy wanted to leave her car at her apartment building.  Page and Murphy drove back to Murphy's neighborhood; Page followed Murphy in his car to her apartment.  While en route, Page saw defendant following Murphy in his brown Saab.

Page further testified that Murphy left her car at her apartment, she got into his car, they went to have a drink, he dropped Murphy off at her apartment, and then he drove home to his apartment.  Upon entering his apartment, Page saw a movement or heard a noise in the apartment that caught his attention.  He then was hit over the head several times and he passed out.  When he later awakened, he made his way out of his apartment to a  neighbor's apartment, an ambulance was called and he was taken to  the Ravenswood Hospital.  Page remained in the hospital for six days, had lacerations on his head, fractures on both orbits of his eyes, multiple bruises, received more than 200 sutures on his head, and needed plastic surgery on his forehead and under one eye.  Page believed he had been hit with a hammer.  Page also stated he subsequently discovered that stereo equipment  had  been taken from his apartment.  On September 10, 1994, Page saw defendant standing in an ally outside his apartment building looking toward his bathroom window.  Page called 911, then went into the kitchen and noticed that defendant was standing outside his kitchen window.  Page yelled at defendant and he ran away.  Page also testified that he saw defendant at Ravinia after attending a concert with Murphy.

Steven Alvertos, the supervisor of admitting at Ravenswood Hospital and Page's supervisor, testified that on June 6, 1994, he received a telephone call from a male caller on Page's private telephone line who asked if he was Page and if he had reached Page's residence.  Alvertos further stated that two days after Page's attack, while Page was still in the hospital, a man called Page's private work telephone number at the hospital and identified himself as George, Page's brother.  Alvertos also stated that later that same day, a man called the hospital asking to speak with Page, claiming to be his friend John.  The man called a couple more times asking for Page, so Alvertos placed an alert in the hospital's computer system so that no information about Page would be given out.  Alvertos also testified that he listened to a tape that Murphy had of defendant's voice and recognized the voice as the man who called the hospital for Page.  

Vanessa Kelly, a volunteer worker, testified that a man claiming to be Page's brother came to the hospital to visit Page and she discovered that an alert was placed on Page's file.  Before Kelly could alert the authorities, the man ran out and drove away in a brown Saab.  Kelly identified defendant as the man who came to the hospital to visit Page.

Leann Murphy testified that she met defendant in late March 1993, and began dating him shortly thereafter.  In November, Murphy told defendant that she did not want to see him anymore, she was going to date other men, and she wanted her house keys back.  Murphy also stated that on June 3, 1994, she met Page at a party and she wrote down Page's private work telephone number, his home telephone number and his home address on a calendar that she kept by her telephone.  On June 4, Murphy and Page went on a day trip together to Indianapolis for a vintage clothing show.  When Murphy returned home, she was told by a friend that he had received two telephone calls that had originated from her apartment.  Murphy subsequently requested a copy of her telephone bill from the telephone company and confirmed that five telephone calls were placed from her telephone the day she was out of town.  Murphy further stated that she changed the locks on her doors on June 7 because she believed defendant had made a copy of her house keys after she broke off their relationship, but before he returned the keys to her.  Murphy also stated that she had shown a photograph of defendant to Page and told him that defendant had been following her around and that he drove a brown Saab. 

Murphy further testified that she obtained an order of protection against defendant on June 15, 1994, but defendant continued to follow her.  Murphy made 15 police reports against defendant and he was arrested 3 times for violating the order of protection.  Murphy saw defendant at Ravinia after attending a concert with Page.  Sometime before July 5, she received a telephone call from Alan Jacobs who told her that he was thinking of taking defendant as a client; Murphy stated that Jacobs told her that he had gotten her telephone number as a reference from defendant.

The State then called eight witnesses who corroborated Murphy's testimony regarding six of the incidents she had reported to the police regarding defendant stalking her.

Alan Jacobs, defendant's therapist, testified that he saw defendant as a patient for the first time on July 5, 1994.  Jacobs stated that defendant had contacted him for therapy and that defendant initially told him that Murphy was harassing him.  Jacobs doubted defendant, and called Murphy to verify his story.  Jacobs had spoken to Murphy prior to meeting with defendant and also spoke to Murphy after he began therapy sessions with defendant.

According to Jacobs, on August 23, 1994, defendant told him that he had attacked Page, he had made copies of Murphy's keys to get into her apartment, and he had obtained Page's telephone number and address from a pad of paper by Murphy's answering machine and was angry at Page for making fun of him on the answering machine. Jacobs further stated that in September 1994, he terminated his relationship with defendant because he felt that defendant kept violating an order of protection that Murphy had against defendant and that defendant would lie to him about it.  Jacobs also stated that he contacted an attorney to obtain advice on whether or not he could give the information that he received from defendant about the attack on Page to the police and warn Page and Murphy.  According to Jacobs, he believed that defendant was getting out of control, defendant's obsession with Page and Murphy was escalating and he believed Murphy and Page were in danger.  After Jacobs received a fax from his attorney as to when he could warn potential victims of a patient, he contacted Murphy and Page to warn them that defendant might be a threat to them.  Jacobs also contacted the police on October 11, and told them about defendant's admission of attacking Page.  On October 13, Jacobs taped a conversation he had with the police in the presence of an assistant State's Attorney.

Defendant presented evidence of an alibi defense through the testimony of several witnesses.  The witnesses testified that they saw defendant at a bar that was 10 blocks from Page's apartment during the time of the attack on Page.  The record is unclear as to the exact time that defendant arrived and left the bar; the times range from defendant arriving at 11:15 to 11:45 p.m. and leaving around 1:30 to 1:45 a.m.

The jury subsequently found defendant guilty of attempted first degree murder, armed robbery, home invasion, residential burglary, aggravated battery, and aggravated stalking.  Defendant filed a motion for a new trial, which the trial court denied.  Thereafter, the court sentenced defendant to 20 years' imprisonment for attempted murder, armed robbery, and home invasion, 15 years for residential burglary, and 5 years for aggravated battery and aggravated stalking, the sentences to run concurrently.  Defendant then filed a motion to reconsider his sentence, which the court denied.  This appeal followed.

Defendant first contends that his admissions to Jacobs regarding his attack on Page and his involvement with Murphy were privileged and were improperly disclosed and erroneously admitted because the admissions were simply admissions of past conduct and were protected by the psychotherapist-patient privilege of the Confidentiality Act (740 ILCS 110.1 
et. seq.
 (West 1996)).  Defendant therefore argues that the trial court erred in ruling that his admissions fell within the exception to the privilege provided for in section 11 of the Confidentiality Act.  740 ILCS 110/11 (West 1996).  Defendant acknowledges that a psychotherapist-

patient relationship existed because Jacobs held himself out as a psychotherapist and defendant reasonably believed that Jacobs was permitted to do so.  However, defendant argues that the record and a plain reading of the communications at issue show that Jacobs could not have believed imminent or immediate harm was likely to occur to anyone and his admissions to Jacobs were "not sufficient to trigger an exception against nondisclosure."

The State contends that Jacobs properly testified at trial about defendant's admissions because Jacobs' testimony clearly fell within the "dangerous person" exception to the psychotherapist-

patient privilege.  The State argues that Jacobs believed that defendant was getting worse, was out of control, and that the situation was escalating and could end in the death of Murphy and Page.

The issue raised concerns the scope of the psychotherapist-

patient privilege provision of the Confidentiality Act.  "The construction of a statute is an issue of law and our review is therefore 
de novo
."  
Boaden v. Department of Law Enforcement
, 171 Ill. 2d 230, 237, 664 N.E.2d 61 (1996).  Section 11 of the Confidentiality Act provides:

"Disclosure of records and communications.  Records and communications may be disclosed, *** (ii) when, and to the extent, a therapist, in his or her sole discretion, determines that disclosure is necessary to initiate or continue civil commitment proceedings under the laws of this State or to otherwise protect the recipient 
or other person against a clear, imminent risk of serious physical or mental injury or disease or death being inflicted upon the recipient or by the recipient on himself or another
; *** [and] (viii) when, and to the extent, in the therapist's sole discretion, disclosure is necessary to warn or protect a 
specific individual
 against whom a recipient has made a 
specific threat
 of violence where there exists a therapist-recipient relationship or a special recipient-individual relationship. *** For the purpose of any proceeding, civil or criminal, arising out of a report or disclosure under this Section, the good faith of any person, institution, or agency so reporting or disclosing shall be presumed."  (Emphasis added.) 740 ILCS 110/11 (1996).

Prior to trial, defendant moved to preclude Jacobs' testimony, arguing that Jacobs did not reasonably believe there was imminent harm to be inflicted on Page and Murphy that would have allowed him to warn under the exception to nondisclosure in section 11 of the Confidentiality Act.  740 ILCS 110/11 (1996).  The trial court reviewed Jacobs' notes from his sessions with defendant and a transcription from a taped conversation Jacobs had with the police.  The trial court found that Jacobs believed that Page and Murphy were in imminent danger of being harmed by defendant when he warned them and, therefore, denied defendant's motion to preclude Jacobs' testimony.

It is well settled that an appellant bears the burden of preserving a sufficient record for review and any doubts arising from an incomplete record will be resolved against the appellant.  
People v. Hinton
, 249 Ill. App. 3d 713, 718, 619 N.E.2d 198, 202 (1993).  When the record presented on appeal is incomplete, this court will indulge in every reasonable presumption favorable to the judgment from which the appeal is taken, including that the trial court ruled or acted properly.  
People v. Majer
, 131 Ill. App. 3d 80, 84, 475 N.E.2d 269 (1985).

The record here does not contain Jacobs' notes or the transcript of the tape that were reviewed by the trial court.  At oral argument before this court, defendant's counsel stated with respect to where the notes were in the record that he "had questions about that *** [himself]," he "went through the record *** [to] try to figure out what if anything happened to them," and he "wasn't able to locate any notes" and "it sure would have been nice to see it."  The State stated the notes "were not exhibits introduced at trial, they were used during the motion 
in
 
limine
 prior to trial," and the "tape transcription is not [in the record] and the court doesn't specifically read the taped transcription but starts reading some of the notes in, but again, it wasn't an exhibit at trial so it isn't part of the exhibit before the court today."  We therefore lack sufficient evidence from the record upon which to consider defendant's argument, and we presume that the trial court properly determined that Jacobs' testimony was admissible.

Defendant next contends that he was denied a fair trial because the State was allowed to introduce detailed and repetitive testimony regarding other crimes for which he was not on trial.  Defendant argues that he was therefore subjected to a mini-trial for "collateral conduct" because the evidence exceeded its purpose of showing motive.  While defendant admits that some evidence regarding his conduct toward Murphy and her male friends was relevant to establish motive, the following was not:  (1) the prosecutor's comment in his opening statement that defendant constantly violated an order of protection Murphy had issued against defendant; (2) Murphy's testimony about 15 separate incidents involving defendant that were unrelated to the attack on Page and the testimony of 8 witnesses who provided details about 6 of the incidents; (3) Murphy's testimony that defendant's nickname in the boxing ring was "Raging Ranstrom"; (4) the prosecutor's comments in his closing argument that defendant stalked, terrorized, and burglarized Murphy; and (5) Jacobs' testimony that he was afraid of defendant and that he and his wife were offered assistance by the State's Attorney's office through the witness protection program.  Defendant also argues that the trial court's instructions regarding the use of this evidence did nothing to cure the prejudice to defendant.  Defendant suggests that the State could have established its motive theory by showing that defendant "peeked through" Murphy's windows, "followed" Murphy around town, and "attempted to contact" Murphy's male friends after his relationship with her "broke off."  Defendant concedes that he has waived appellate review of these alleged errors by failing to object at trial or in a post-trial motion.  However, defendant urges that we review them under the plain error doctrine because both prongs of the plain error rule are met.

The State contends that the extensive and detailed evidence of defendant's obsessive behavior toward Murphy and her male friends was properly admitted because it established defendant's motive and intent, elements of the crime with which defendant was charged, in attacking Page.  The State argues that the evidence clearly showed that defendant became obsessed with Murphy and supported its theory of why defendant attacked Page.  The State further argues that the witnesses were called to corroborate Murphy's testimony and establish by more than a mere suspicion that defendant committed the other crimes of stalking Murphy and violating the order of protection she had against him.  The State also maintains that the evidence revealing defendant's kickboxing name was properly admitted because defendant's status as a kickboxer was an issue in the case.  The State further argues that defendant has waived his argument, that the State made improper closing comments in calling defendant "Raging Ranstrom" and in arguing that defendant stalked, terrorized, and burglarized Murphy, because defendant did not object during the State's closing argument or in his motion for a new trial.  The State also maintains that the trial court's sustaining of defendant's objection to, and instructing the jury to disregard Jacobs' testimony that he was afraid of defendant and he was a participant in the witness protection plan, cured any error as to this testimony.

A defendant must object to an error at trial and include the objection in a post-trial motion in order to preserve it for review on appeal.  
People v. Enoch
, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988).  "[T]he prompt sustaining of an objection by a trial judge is sufficient to cure any error in a question or answer before the jury."  
People v. Alvine
, 173 Ill. 2d 273, 295, 671 N.E.2d 713 (1996).  Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)) allows a reviewing court to "notice waived errors if either the evidence is closely balanced or the error is fundamental and of such magnitude that the accused was denied a fair trial and remedying the error is necessary to preserve the integrity of the judicial process."  
People v. Gonzalez
, 238 Ill. App. 3d 303, 314, 606 N.E.2d 304 (1992).  However, "before plain error can be considered as a means of circumventing the general waiver rule, it must be plainly evident from the record that an error affecting substantial rights was committed."  
People v. Rodriguez
, 275 Ill. App. 3d 274, 281, 655 N.E.2d 1022 (1995).  For the reasons discussed below, we find that the plain error rule does not apply.

"Evidence of crimes other than those for which a defendant is on trial is inadmissible if relevant merely to show his propensity to commit crime."  
People v. Nunley
, 271 Ill. App. 3d 427, 431, 648 N.E.2d 1015 (1995); 
People v. McKibbins
, 96 Ill. 2d 176, 182, 449 N.E.2d 821 (1983).  The evidence may be admitted if relevant for any purpose other than to show propensity, such as intent or motive.  
McKibbins
, 96 Ill. 2d at 182
.  The evidence "should be excluded if its probative value is outweighed by the dangers of unfair prejudice, jury confusion or delay. *** If other crimes evidence is admitted, it should not lead to a mini-trial of the collateral offense."  
Nunley
, 271 Ill. App. 3d at 431-32; 
McKibbins
, 96 Ill. 2d at 186-87.
  It is within the sound discretion of the trial court to determine whether evidence of other crimes is relevant to a material issue and whether the probative value of such evidence outweighs its prejudicial impact.  
People v. Charles
, 238 Ill. App. 3d 752, 760-61, 606 N.E.2d 603 (1992).

In the present case, the State's theory of why defendant attacked Page was that he was obsessed with Murphy after she ended their romantic relationship and that Page was Murphy's new boyfriend.  The State maintains that in order to establish the profound nature of defendant's obsession, it had to reference the number of times and manner in which defendant disregarded an order of protection and defendant's repeated arrests for violations of the order of protection, as well as make reference to Murphy as the stalking victim.  At the pretrial hearing on the State's motion to introduce evidence, the State identified each incident it would introduce at trial of defendant's violation of an order of protection that was issued against him, stalking, and following Murphy.  The State went through every incident in detail, including whether or not defendant was arrested.  After hearing the detailed incidents, the trial court ruled that the evidence was more probative than prejudicial because it established that defendant had a motive to attack Page since he was obsessed with Murphy.

We conclude that the attack on Page would be difficult to explain without introducing a substantial amount of the evidence concerning defendant's obsessive behavior toward Murphy.  Additionally, the State's introduction of the fact that defendant was a national kickboxing champion, known as "Raging Ranstrom," was not prejudicial; it was relevant to the material issue of why defendant used a hammer in his attack on Page, which was to divert attention away from himself since he was a kickboxer.  We do not agree with defendant's suggestion that introducing only evidence, such as that defendant "peeked through" Murphy's windows, would be enough to establish the State's theory that defendant was obsessed with Murphy.  Defendant continually followed Murphy, broke into her apartment, and violated the order of protection issued against him, which in four cases led to his arrest.  The detailed evidence of defendant's obsessive behavior toward Murphy was properly admitted to show defendant's motive and intent for attacking Page, and its probative value outweighed any prejudicial impact.  Further, any error due to Jacobs' testimony that he was a participant in the witness protection program was cured by the trial court in sustaining defendant's objection and instructing the jury to disregard the statement.  We therefore hold that defendant was not denied a fair trial by the admission of other crimes evidence.

Defendant next contends that he was denied his constitutional right to confront witnesses against him because his counsel was prohibited from exposing biases and a motive to lie on the part of Jacobs.  Defendant argues that the trial court abused its discretion in restricting the cross-examination and impeachment of Jacobs by prohibiting defendant's counsel from asking Jacobs if he routinely "verifies" through a third party the veracity of a client's communications and if Jacobs was Murphy's therapist.  Defendant maintains that Jacobs' credibility was critical to the State's case and his counsel should have been given the widest latitude to explore Jacobs' potential biases and ulterior motives for testifying.  Defendant also argues that Jacobs received the essential details surrounding Page's attack from Murphy, and that Jacobs was motivated to make up defendant's alleged confession because of his relationship with Murphy and his desire to be a hero to her.  Defendant concedes that he has waived appellate review of this alleged error by failing to object at trial or in a post-trial motion.  However, defendant urges that we review this issue under the plain error doctrine because the error was of such magnitude that it denied him his right to a fair trial and the evidence in this case was closely balanced.  Defendant also argues that the error should not be dismissed as harmless because there is a significant likelihood that the jury could have reached a different conclusion regarding Jacobs' credibility and ultimately its verdict in this case.

The State contends that the plain error rule is inapplicable to this issue because neither of the prerequisites, that the evidence is closely balanced or the error is of such a magnitude that the defendant was denied a fair trial, have been met.  Alternatively, the State argues that even if error occurred, the evidence of defendant's guilt was overwhelming and the error was harmless.  The State also argues that in considering the cross-

examination allowed by the trial court versus the inquiry disallowed by the court, it is clear that the court allowed the jury to hear sufficient testimony of any potential bias of Jacobs against defendant.  The State further maintains that defendant's theory, that Jacobs was fabricating testimony because he had a psychotherapist relationship with Murphy, was highly speculative and defendant did not have a "license" to engage in a speculative attack on a witness.  The State also argues that any testimony as to whether Jacobs unofficially acted as Murphy's psychotherapist was completely collateral to the issue of whether defendant stalked and attacked Page.

We find that defendant has waived this issue, and that the plain error rule is inapplicable.  Notwithstanding defendant's waiver, we note the following as to this issue.  It is well settled that it is within the sound discretion of a trial judge to impose limits on cross-examination.  
People v. Jefferson
, 260 Ill. App.3d 895, 904, 631 N.E.2d 1374 (1994); 
People v. Fierer
, 260 Ill. App. 3d 136, 148, 631 N.E.2d 1214 (1994), citing 
People v. Harris
, 123 Ill. 2d 113, 144, 526 N.E.2d 335 (1988).  "Although generally allowed wide latitude in cross-examining the State's witnesses to show motive to testify falsely, defense counsel does not have a 'license to engage in speculative attacks on that witness.'"  
People v. Allgood
, 242 Ill. App. 3d 1082, 1087, 611 N.E.2d 1127 (1993).

Defendant argues that the trial court did not allow him to question Jacobs to properly impeach him on cross-examination on matters such as his bias and a motive to testify falsely.  Specifically, defendant argues that he was prohibited from asking Jacobs if he routinely verified, through a third party, the veracity of a client's communications; if Jacobs was Murphy's therapist; and in what way Jacobs acted as Murphy's therapist.  Contrary to defendant's argument, however, the trial court did in fact allow the jury to hear sufficient testimony of any potential bias Jacobs had against defendant, when Jacobs was questioned about:  his contact with Murphy; the content, length, and frequency of the conversations that took place; his contact with Murphy's therapist; and whether defendant had given him permission to contact Murphy.  Further, Jacobs did state during cross-examination by defendant's counsel that he acted as Murphy's psychotherapist "in a way."

We also briefly note that defendant's argument, that during cross-examination he was trying to show Jacobs' bias because Jacobs wanted to be Murphy's hero, is speculative and, therefore, the exclusion of this testimony could not have affected the result of the trial.  
Allgood
, 242 Ill. App. 3d at 1087.  Moreover, we agree with the State that whether Jacobs acted as Murphy's psychotherapist was collateral to a determination of whether defendant attacked Page.  The purpose of defendant's counsel's questioning of Jacobs on cross-examination as to whether he was Murphy's psychotherapist could only be used to contradict Murphy's testimony concerning her contact with Jacobs and contradict Jacobs' testimony concerning his interest in treating defendant.  This testimony would not provide the jury with any additional information on the issue of defendant's attack upon Page.  Accordingly, we conclude that any potential bias and motive that Jacobs may have had against defendant were in fact elicited by defendant's counsel.

Finally, defendant contends that his conviction for residential burglary must be reversed because the State failed to prove beyond a reasonable doubt that he entered Page's apartment with the intent to commit a theft.  Defendant argues that in order to prove residential burglary, the State must prove that defendant possessed the intent to commit a theft 
at the time of his unauthorized entry
 into Page's dwelling.  However, because the State's theory was that defendant, 
after
 attacking Page, took stereo equipment from the apartment to conceal his identity, no inference could be made that defendant intended to commit a theft at the time of entry into Page's apartment.  Defendant also argues that his confession to Jacobs only established that he wanted to "get Page for making fun of him" and there was no evidence from his testimony to infer he had the intent to take the stereo equipment upon entry into Page's apartment.

The State argues that the evidence established that "defendant planned to take items from [Page's] apartment so that it looked like [Page] was beaten after he surprised a burglar when he returned home."  More specifically, the State maintains that when Page came home, defendant repeatedly hit him with a hammer because he did not want anyone to suspect him since he was a national kickboxing champion, and defendant took stereo equipment to make it look like a burglary.  Accordingly, the State argues that defendant went to Page's apartment with a "distinct plan" in that he intended to break into Page's apartment and beat up Page and it is clear that defendant "formulated and implemented" a plan to divert attention away from himself and used a hammer and took the stereo equipment.  Finally, the State argues that even if defendant did not have the intent to commit a theft when he entered Page's apartment, the evidence is sufficient to support his conviction for residential burglary because defendant intended to commit a felony, 
i
.
e
. to beat Page with a hammer.

The Criminal Code of 1961 provides that a person commits residential burglary when he "knowingly and without authority enters the dwelling place of another with the intent to commit therein a felony or theft."  720 ILCS 5/19--3(a)(West 1996).  In reviewing a defendant's conviction, the question is whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the prosecution.  
People v. Campbell
, 146 Ill. 2d 363, 374, 586 N.E.2d 1261 (1992), 
citing
 
People v. Collins
, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985).  A reviewing court will not substitute its judgment for that of the trier of fact on questions involving the sufficiency of the evidence and will not reverse a criminal conviction unless the evidence is so contrary to the verdict or unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of guilt.  
Campbell
, 146 Ill. 2d at 375, 
citing
 
People v Young
, 128 Ill. 2d 1, 51, 538 N.E.2d 461 (1989), 
Collins
, 106 Ill. 2d at 261.  The fact finder may infer the requisite intent to commit theft from proof of an unlawful breaking and entry into a building containing personal property that could be the subject of larceny.  
People v. Monigan
, 204 Ill. App. 3d 686, 689, 561 N.E.2d 1358 (1990), 
citing
, 
People v. Loden
, 27 Ill. App. 3d 761, 327 N.E.2d 58 (1975).  "Because evidence of intent is usually not direct, it may be proved circumstantially by inferences reasonably drawn from the circumstances of the defendant's conduct."  
Monigan
, 204 Ill. App. 3d at 688, 
citing 
People v. Snow
, 124 Ill. App. 3d 955, 464 N.E.2d 1262 (1984).  Such inferences of intent include the circumstantial evidence of the facts, including the time, place, and manner of entry into the premises, the defendant's activity within the premises, and any lack of alternative explanations for his presence.  
People v. Ybarra
, 272 Ill. App. 3d 1008, 1011, 651 N.E.2d 668 (1995), 
citing
 
People v. Richardson
, 104 Ill. 2d 8, 470 N.E.2d 1024 (1984).

In the present case, the evidence elicited from Jacobs was that defendant wanted to divert attention away from himself for the attack on Page and, accordingly, defendant took stereo equipment to make the attack look like a burglary.  Defendant attempts to argue that there was no evidence from which one could infer that he had formulated the intent to take the stereo equipment upon his entry into Page's apartment.  
However, "it is not essential to a burglary conviction that the State prove the actual commission of the felony intended at the time of entry."  
Monigan
, 204 Ill. App. 3d at 690.  A burglary conviction will stand "upon satisfactory proof that [a defendant] intended to commit one felony *** and succeeded in committing another."  
Monigan
, 204 Ill. App. 3d at 690.  After reviewing the evidence, we conclude that the evidence sufficiently supported defendant's residential burglary conviction; the evidence shows that defendant did in fact have the intent to commit a felony when he entered Page's apartment, 
i
.
e
. his intent to beat Page with a hammer.  In viewing the evidence in the light most favorable to the prosecution, we believe that any rational trier of fact could have found defendant guilty beyond a reasonable doubt of residential burglary.

For the reasons stated, we affirm the judgment of the circuit court.

Affirmed.

CAHILL, P.J., and CERDA, J., concur.