# Illinois Official Reports

## Appellate Court

---

### *People v. McGee*, 2015 IL App (1st) 122000

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DARRYL McGEE, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-12-2000 |
| Filed<br>Rehearing denied | January 23, 2015<br>February 18, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for stalking a Chicago Transit Authority employee was reversed and the cause was remanded for a new trial where the trial court erred in admitting, pursuant to the State's motion, evidence with respect to an incident in which defendant and the alleged victim's husband engaged in a violent encounter shortly after defendant appeared at the station where the wife worked and defendant cut the husband's arm, leaving a wound requiring 100 stitches, since the husband declined to bring charges against defendant and evidence related to the altercation between defendant and the husband was not part of defendant's alleged course of stalking conduct and was not relevant to prove his intentions toward his alleged victim. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-19970; the Hon. Lauren Gottainer Edidin, Judge, presiding. |
| Judgment | Reversed and remanded. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Melinda Grace Palacio, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Matthew Connors, and Noah Montague, Assistant State's Attorneys, of counsel), for the People. |
| | |
| Panel | PRESIDING JUSTICE HOFFMAN delivered the judgment of the court, with opinion. |
| | Justices Lampkin and Rochford concurred in the judgment and opinion. |

**OPINION**

¶ 1    After a jury trial, the defendant, Darryl McGee, was convicted of stalking (720 ILCS 5/12-7.3(a)(1) (West 2010)) a Chicago Transit Authority (CTA) employee and sentenced to a term of 30 months in prison. On appeal, he contends his conviction should be reversed where the State failed to prove his guilt beyond a reasonable doubt. Alternatively, he argues that he is entitled to a new trial where the circuit court erred in admitting highly prejudicial evidence of other crimes and failing to comply with Illinois Supreme Court Rule 431(b) (eff. May 1, 2007). For the reasons that follow, we reverse and remand the cause for a new trial.

¶ 2    In November 2010, the defendant was indicted on two counts of stalking. Count I alleged that, on October 4, 2010, and continuing through October 8, 2010, the defendant knowingly engaged in a course of conduct directed at Vicki Glanz, "to wit: repeatedly arrived at [her] place of employment yelling obscenities, and he knew or should have known" that his conduct would cause a reasonable person to fear for her safety. 720 ILCS 5/12-7.3(a)(1) (West 2010). Count II alleged the same conduct in violation of section 12-7.3(a)(2) of the Criminal Code of 1961 (Code) (720 ILCS 5/12-7.3(a)(2) (West 2010) (knew or should have known conduct would cause a reasonable person to suffer other emotional distress)).

¶ 3    On August 2, 2011, the State filed a motion *in limine* seeking to admit evidence of other crimes by the defendant. Specifically, the State sought to admit evidence of an altercation between the defendant and Vicki's husband, Christopher Glanz, which occurred on October 8, 2010. According to the State's motion, Christopher confronted the defendant about his harassment of Vicki and a physical altercation ensued which resulted in the defendant stabbing Christopher in his arm with a box cutter and the defendant requiring hospitalization for his injuries. The State asserted that, while Christopher declined to press charges for his injury, evidence of the altercation was relevant to prove the defendant's violent intent toward Vicki. The State further argued that the altercation corroborated Vicki's concerns for her safety and showed the defendant's "continuing narrative which began with the harassment and threats to Vicki Glanz and ended with the assault on her husband." The defendant objected to the admission of the evidence, arguing that Christopher was the

- 2 -

aggressor in the altercation and that the altercation was unrelated to his alleged conduct directed at Vicki.

¶ 4    The circuit court granted the State's motion, finding that the indictment covered October 8, 2010, which was the date of the altercation. The court also stated that whether the altercation constituted part of the course of stalking conduct was a matter for the trier of fact.

¶ 5    On June 13, 2012, the defendant's trial commenced with a different presiding judge than the judge that granted the State's previous motion *in limine.* Although the defendant renewed his objection to the other-crimes evidence, the circuit court allowed the previous judge's ruling to stand.

¶ 6    Vicki, a CTA combined rail operator, testified that, in October 2010, she was assigned to work at the Evanston Central Street Purple Line station, where she had been working for several years. On days she did not operate a train, she worked in the station's customer service kiosk, which was located near the turnstiles where customers entered to board the train or exit the station. Vicki stated that customers often approached the kiosk to ask her questions and that she was the only CTA employee working at that location to assist customers.

¶ 7    According to Vicki, around 3 p.m. on October 4, 2010, the defendant entered the station and stood near the turnstile. Because his train pass was not working, the defendant asked Vicki for assistance. She testified that she used her access card to allow the defendant through the turnstile because his card was damaged. After the defendant walked through the turnstile, Vicki returned to the other customers that she had been speaking with. However, she noticed that the defendant never walked upstairs to the train platform but remained standing in her vicinity. Vicki asked if he needed any other assistance, and the defendant asked her where the "201 bus" was located. She told him that bus was outside, pointing toward the doors that open to Central Street. Again, the defendant did not move, but instead asked Vicki where he could find the 201 bus to which she gave him the same answer. When the defendant asked her the same question a third time, another customer answered "[d]ude, it's right outside. You have to go outside to get the bus." The train then approached and the crowd near Vicki ran upstairs to board it, but the defendant did not move. At that point, Vicki noticed that another customer needed assistance, so she walked to that person near the turnstile. She stated that the defendant walked behind her and stood "very close" to her. She asked him whether he needed anything else, and he repeated the same question about the 201 bus. Vicki testified that she told him that she had answered that question and that there was nothing more for them to discuss. She turned and walked toward her kiosk, but the defendant started "cursing and calling [her] names," such as "nigga bitch." Vicki entered her kiosk and called the CTA control center.

¶ 8    According to Vicki, the controller heard the defendant yelling in the background and asked her whether she was okay. She told the controller what happened and asked for the police to be called. Vicki testified that the defendant was "cursing[ and] banging on the windows" of her kiosk while she was on the phone. After she hung up the phone, the defendant ran upstairs and then returned, continuing to call her names and stating that he would "get her schedule," "find her," and that he was "going to get [her]." The defendant then went back upstairs, and the police arrived. Vicki told the officer that the defendant went upstairs and the officer proceeded to look for him. When the officer returned alone, Vicki asked about the defendant, and the officer told her that she allowed him to board the train.

Vicki asked the officer why she allowed that, and the officer stated that he did not do anything wrong. At that point, Vicki informed the officer that the defendant had threatened her. The officer told Vicki that she did not have that information beforehand and told her to call the police if the defendant returned.

¶ 9 No surveillance video from October 4, 2010, was admitted into evidence. However, Evanston police officer Conley testified that she responded to the October 4 dispatch, but she was not informed of any specific threats made to an individual. When she arrived at the scene, Vicki immediately stated that the defendant "went upstairs, go get him," but she did not mention any physical threats. Officer Conley located the defendant, told him to leave the CTA employee alone, and allowed him to get on the train. When Officer Conley told Vicki that she let the defendant board the train, Vicki informed her that he had threatened her and said that he was "going to kick her ass or beat her ass." Officer Conley advised Vicki to call the police if the defendant returned.

¶ 10 Vicki testified that around 3 p.m. on October 8, 2010, she was sweeping outside her kiosk when the defendant appeared "in [her] face," asking where he could find the 201 bus. Vicki turned around, entered her kiosk, and called the CTA control center. The defendant "started banging on the windows and calling [her] names again, calling [her] bitch." Turning away from the defendant, Vicki began to cry and asked the controller to remain on the phone with her until the police arrived. While waiting for the police, Vicki used her cell phone to call her husband and left him a message; she also called an Evanston police officer whom she knew personally. According to Vicki, it seemed like the incident went on for "maybe 20 minutes." The controller, who was watching through the security cameras, told Vicki that the defendant had left. But he returned shortly thereafter and continued banging on her window and calling her "a bitch." The defendant left again, and the police arrived minutes later. Vicki told the officer that the defendant went outside. Shortly thereafter, the officer returned without the defendant and told Vicki to call the police if he returned.

¶ 11 The surveillance video of October 8 was admitted into evidence and published to the jury. The video does not contain any audio. Vicki testified as the video played, confirming the accuracy of the depiction of the incident around 3 p.m. The video depicts Vicki inside her kiosk and the defendant standing outside of it, speaking to her through the glass. The defendant, who is carrying a backpack, then repeatedly knocks on the window with his knuckles for a few minutes, walks away, then returns, again knocking on the window until he finally leaves the station a few minutes later. An officer arrives, speaks to Vicki, and leaves the scene. The incident does not exceed 10 minutes in duration.

¶ 12 Vicki further testified that, around 4:30 p.m. on October 8, her husband, Christopher, arrived at the station. Around 5 p.m., the defendant walked into the station. When Vicki saw him, she "was afraid" and "went silent." Christopher asked her if that was the man harassing her, and Vicki told him that it was. She went into her kiosk to call the CTA control center, and Christopher confronted the defendant. Vicki testified that she did not hear their conversation, but she heard that their voices were loud and she saw that their faces were close to one another. The two men then began fist-fighting. She stated that both Christopher and the defendant were throwing punches, and she saw that Christopher was bleeding. However, Vicki testified that she did not see a weapon.

¶ 13 Vicki testified that she reported both the October 4 and October 8 occurrences to her manager and documented them in "the daily reports." She stated that, after the October 4

occurrence, she felt "scared" and "afraid" of the possibility that the defendant would return to the station while she was working. When he did return on October 8, she testified that she felt "very scared," "helpless," "embarrassed," and "weak." She stated again that she "was afraid of the defendant," and that she feared that he would harm her.

¶ 14    On cross-examination, Vicki clarified that, on October 4, the defendant "banged" on the kiosk window with his "fists," but on October 8, he "banged" on the window with his "knuckles." When asked whether the defendant said that he was "going to hurt" her on October 4, Vicki answered that she "should have said it before, but [the defendant] said he was going to kick my ass." She explained that she did not testify to that fact on her direct examination because she "was just shaken up." Further on cross-examination, Vicki admitted that when the defendant returned on October 8, he did not "kick [her] ass," touch her, or pull a weapon on her, and when he returned later that day, he did not speak to her or walk toward her kiosk. Rather, she admitted that Christopher initiated contact with the defendant.

¶ 15    Christopher testified that, on October 8, 2010, Vicki left a voicemail message on his cell phone around 3 p.m., prompting him to drive to her workplace. Around 5 p.m., the defendant walked into the station and Vicki "turned pale," telling Christopher that he was the passenger that had harassed her that day. Christopher testified that he immediately confronted the defendant, yelling at him to leave the station and to leave Vicki alone. He said that the defendant responded by stating that he was just trying to catch the train and that he had only asked Vicki where the 201 bus could be found. Christopher stated that he continued "cussing and hollering" at the defendant, who then responded by parroting his words. According to Christopher, their faces were very close and, when their noses touched, the defendant tried to bite him. Within that moment, Christopher shoved the defendant, and the defendant cut Christopher's arm. He testified that, after he was cut, he punched the defendant in the face repeatedly and continued punching him and kicking him while he was on the ground. After the fight, Christopher used his shirt to wrap his arm and began to walk down the block to the hospital. However, he returned to the station when he saw the defendant standing at the bus stop because he wanted to "protect his wife." Christopher identified a photograph of his wound, which required over 100 stitches, and he displayed the scar on his arm for the jury to view. In addition, Christopher identified photographs of the defendant's backpack and the box cutter later retrieved from the backpack that day.

¶ 16    Defense counsel thoroughly cross-examined Christopher on the fact that he initiated the fight with the defendant. On redirect examination, the State asked Christopher whether he declined to press charges against the defendant for aggravated battery, which he responded that he did. Defense counsel objected to the question and moved for a mistrial, arguing that the fact no additional charges were filed in connection to the fight was beyond the scope of his cross-examination and highly prejudicial because the jury could speculate as to whether there might have been an additional charge filed against the defendant. The circuit court denied the defendant's motion for a mistrial and overruled the objection, finding that the other-crimes evidence motion had been granted and the State mentioned that Christopher declined to press charges in its opening statement, with no objection. Indeed, the assistant State's Attorney stated during her opening argument that Christopher "told the police, 'Look, I got my justice of the street, you don't have to charge him with anything.' "

¶ 17    The October 8 surveillance video depicting the altercation between the defendant and Christopher was published to the jury. In the video, the defendant, who is carrying a

backpack, walks into the station and attempts to use his CTA card to pass through the turnstile while Christopher, who is standing near the turnstile, speaks to Vicki through the window of her kiosk. As the defendant's card fails to let him through the turnstile, Christopher confronts him. Although there is no audio, the men appear to be yelling at each other, and they are standing very close together. When their faces are nearly touching, the defendant makes a motion toward Christopher's face with his head, and Christopher shoves the defendant backward. The defendant then reaches into his pocket and pulls out a small item with his hand. The two men continue yelling at each other, and Vicki exits her kiosk for a moment to watch the fight. Christopher repeatedly punches the defendant until he falls to the ground. He then repeatedly kicks the defendant. As Christopher walks away from the defendant, he wraps his arm with his shirt, and the defendant attempts to stand up, but falls down in the background.

¶ 18    Evanston police officer Nicholas Demos testified that he responded to the initial October 8 dispatch in which Vicki told him that she was being harassed by someone and that the individual was "pounding on the glass of her booth." Officer Demos searched the area but did not find anyone fitting the defendant's description. Later that day, he returned to the station to respond to the altercation between the defendant and Christopher. Upon arriving at the station, Officer Demos found the defendant's backpack in the lobby and retrieved a box cutter from the inside of it. He identified the photos of the backpack and box cutter.

¶ 19    The defendant testified in his defense, stating that, on October 4, 2010, he was traveling to a job interview with the Vector Company in Skokie. He was not familiar with the CTA schedule, so when he arrived at the station, he approached Vicki to ask about the 201 bus schedule. According to the defendant, Vicki was "very ambiguous and very rude and very bitter and inattentive." She told him the bus was "over that way." The defendant walked around for a minute, but he was confused so he returned and knocked on the kiosk window. He denied that he "banged" on the window. Again, Vicki told him vaguely that the bus was "over there." The defendant testified that he eventually left, returned, and then again asked Vicki about the bus. He stated that she remained rude and ambiguous, so he left and walked up to the train platform at which time Officer Conley approached him. The defendant denied admitting to Officer Conley that he called Vicki a "bitch." He also denied ever threatening Vicki or stating that he would "kick her ass." The State called Officer Conley in rebuttal, and she testified that the defendant admitted to her that he called Vicki a "bitch." The defendant testified that, in the evening, he reported Vicki's unprofessional behavior by calling the CTA's 888 phone number.

¶ 20    The defendant testified that, on October 8, 2010, he returned to the CTA station to travel to his interview at the Vector Company, which had been rescheduled from October 4. He asked Vicki about the 201 bus, hoping she would be more helpful, but she again responded rudely and ambiguously. He left for his interview. He denied that he called Vicki names or banged on her window. When he returned to the station, his CTA card did not work because it was damaged. The defendant testified that, as he began to look up from the turnstile, Christopher confronted him by "yelling and cursing" at him. According to the defendant, he told Christopher that he was simply trying to catch the train, but Christopher pushed him backward and attacked him. The defendant stated that Christopher punched him multiple times and kicked him several times while he was lying on the ground. As a result of the fight, the defendant was hospitalized for internal head injuries and cracked ribs.

¶ 21    On cross-examination, the defendant admitted he arrived for his interview late on October 4 and that the company rescheduled it for October 8. However, he denied that he was angry about having been late. The defendant further denied that he had a box cutter in his possession on October 8, that he used it to cut Christopher, or that it was found in his backpack. However, he identified the backpack in the photograph as the one that he had been carrying that day.

¶ 22    The jury found the defendant guilty of both stalking counts, and the circuit court denied the defendant's motion for a new trial. After a hearing, the court sentenced the defendant to 30 months' imprisonment on one count of stalking, finding the second count merged pursuant to the one-act, one-crime rule. This appeal followed.

¶ 23    We first address the defendant's argument that the circuit court erred in admitting evidence of his altercation with Christopher. At the outset, we reject the State's argument that the defendant forfeited this evidentiary issue because he failed to preserve it in a posttrial motion. The record demonstrates that the defendant objected to the State's motion *in limine* to introduce the evidence, renewed the objection before the new trial judge, and raised the issue sufficiently in his motion for a new trial. Thus, we find that the defendant properly preserved the issue for review.

¶ 24    The defendant contends that the evidence of his altercation with Christopher was not part of his alleged course of stalking conduct and was not relevant to prove his intent toward Vicki. Even if the evidence was relevant to the stalking offense, the defendant argues that the court erred in allowing the altercation to become the focal point of the trial. Accordingly, he maintains that the introduction of this highly prejudicial evidence requires reversal. The State counters that the evidence of the defendant's altercation with Christopher, including his indigent responses to Christopher's requests that he leave Vicki alone and his possession of a "deadly weapon," showed that his "intent throughout the entire course of conduct" was not merely his lack of understanding the public transit system schedule. We agree with the defendant and, for the reasons that follow, we reverse and remand for a new trial.

¶ 25    Evidence of a crime or other bad acts for which a defendant is not on trial is inadmissible if relevant merely to establish the defendant's propensity to commit crime. *People v. Placek*, 184 Ill. 2d 370, 385 (1998). "Such other-crimes evidence is objectionable because a jury, upon hearing this evidence, might convict the defendant merely because it feels that the defendant is a bad person who deserves punishment." *Id.* Exceptions exist, of course, to allow the admission of other-crimes evidence when it is relevant to establish any material question other than the defendant's propensity to commit a crime. *Id.* For instance, our courts have deemed other-crimes evidence admissible if relevant to demonstrate knowledge, intent, motive, design, plan or identification. *People v. Lindgren*, 79 Ill. 2d 129, 137 (1980). Other-crimes evidence has also been deemed admissible when the evidence: was relevant in placing a defendant in proximity to the time and place of the presently charged offense; tended to prove a fact in issue; rebutted an alibi defense; or demonstrated a consciousness of guilt. *People v. Diaz*, 78 Ill. App. 3d 277, 279-80 (1979). However, even where other-crimes evidence is relevant for a permissible purpose, the circuit court must weigh the prejudicial effect of admitting the other-crimes evidence against its probative value. *Placek*, 184 Ill. 2d at 385. The court should exclude evidence of other crimes where its prejudicial effect substantially outweighs its probative value. *Id.* The admissibility of other-crimes evidence

rests within the sound discretion of the circuit court, and we will not overturn its decision absent a clear abuse of that discretion. *Id.*

¶ 26    In *Lindgren*, the supreme court affirmed the appellate court's decision reversing the defendant's armed robbery and murder convictions and remanding for a new trial because the trial court erroneously admitted highly prejudicial evidence of a subsequent arson crime which was unrelated to the charged crime. *Lindgren*, 79 Ill. 2d at 132-33. The defendant was charged with the armed robbery and murder of Arthur Lewis which took place around midnight on April 17-18, 1977. *Id.* At trial, witness Ina Lewis testified that, about an hour after the defendant returned from the murder scene, he drove her to his ex-wife's home and set the home on fire. *Id.* at 134-35. Lewis testified that the defendant had stated that he warned his ex-wife earlier that day that he would burn the home down if she was not home when he returned. *Id.* at 134. After they left the ex-wife's home, the car that they were traveling in got stuck in a ditch. *Id.* The next morning, while waiting near the incapacitated vehicle, both Lewis and the defendant were arrested. *Id.* at 135. Just before the arrest, the defendant asked Lewis to " 'ditch' " his gun and wallet, which she did. *Id.*

¶ 27    The defendant objected to the admission of the arson evidence, arguing that it was unrelated to his charges for which he was on trial. *Id.* The State contended that the evidence was relevant to demonstrate a consciousness of guilt, because under its theory, the defendant stole the gun from his ex-wife's home earlier in the day and burned the home down after using the gun in the murder in order to conceal the fact the gun was missing. *Id.* at 137-38. The supreme court rejected the State's "strained interpretation of events," noting that: metal does not burn; Lewis testified that the defendant did not ask her to conceal the weapon until after the arson; and the defendant provided a different reason for burning his ex-wife's home down. *Id.*

¶ 28    The supreme court also rejected the State's argument that the arson evidence was admissible because it established his presence near the scene of the crime. *Id.* at 138-39. The court stated that "[g]enerally, time and place proximity, without more, is an insufficient basis for permitting other-crimes evidence." *Id.* at 139. The court noted that proximity plus additional reasons, such as relevance to the defendant's knowledge, common design or scheme, or identity, may support the admissibility of other-crimes evidence, but that none of these reasons were present in its case. *Id.* The supreme court explained that the arson evidence added nothing to the State's case as Lewis already testified to the defendant's presence at the robbery and murder scene, establishing time and place proximity. *Id.* For similar reasons, the court rejected the State's contention that the arson evidence was admissible as part of a "continuing narrative of [the] crime." *Id.* at 139-40. The supreme court found that the arson was a "distinct crime undertaken for different reasons at a different place at a separate time." *Id.* at 140.

¶ 29    While the supreme court acknowledged that the admission of prejudicial evidence may be deemed harmless, the "extensive discussion of the collateral crime of arson" was not harmless. *Id.* at 141. The court stated that the arson evidence "could have influenced the jury to convict him only out of a belief that he deserves punishment." *Id.* The court acknowledged that its opinion was not a finding of the defendant's innocence and that an uncontaminated jury could find Lewis's testimony regarding the robbery and murder credible. *Id.* at 142. However, it is the jury's function as the fact finder to determine witness credibility and resolve conflicts in the testimony. *Id.* Thus, the court remanded the cause for a new trial. *Id.*

¶ 30        We find the facts of *Lindgren* comparable to the facts of the case at bar. Like in *Lindgren*, we do not accept the State's contention that the defendant's altercation with Christopher constituted a continuing narrative of his alleged stalking offense toward Vicki as the altercation was a "distinct" event "undertaken for different reasons" at a different time. See *Lindgren*, 79 Ill. 2d at 140. Other-crimes evidence is admissible if it is part of a continuing narrative of the event giving rise to the offense or is intertwined with the offense charged. *People v. Abernathy*, 402 Ill. App. 3d 736, 751 (2010). Stated otherwise, when facts concerning the uncharged criminal conduct are part of a continuing narrative of the charged criminal conduct, they do not concern separate, distinct, and unconnected crimes. *Id.* (finding evidence of fire at the home where the charged domestic battery offense occurred minutes before was part of continuing narrative surrounding the domestic violence incident).

¶ 31        In this case, the defendant allegedly stabbed Christopher for a distinct reason and after the time the charged offense was completed. The defendant was charged with stalking Vicki under sections 12-7.3(a)(1) and (a)(2) of the Code by "repeatedly arriv[ing] at [her] place of employment yelling obscenities" when he knew or should have known that his conduct would cause a reasonable person to fear for her safety or suffer other emotional distress. The altercation between the defendant and Christopher occurred approximately two hours after the defendant's October 8 interaction with Vicki and did not involve any contact with Vicki. Rather, Vicki, Christopher and the defendant all testified that, when the defendant returned to the station on October 8, he said nothing to Vicki and did not approach her; rather, he walked to the turnstile at which time Christopher confronted and attacked him. Christopher admitted that he initiated contact with the defendant and admitted that the defendant never approached Vicki at that time, but had stated that he was only trying to ride the train. The surveillance video substantiates the witnesses' testimony in this regard. Thus, we cannot find that the altercation constituted a continuing narrative of the defendant's alleged stalking conduct directed at Vicki.

¶ 32        Similarly, we reject the State's argument that the evidence proves the defendant's intent to harm Vicki by showing that he arrived at her workplace with a "deadly weapon." Like the court in *Lindgren* determined that the arson crime was not necessary to establish the defendant's time and proximity to the murder scene, evidence of the altercation did not need to be admitted in this case in order to bring in evidence that the box cutter was retrieved from his backpack later in the day when he was arrested. See *People v. Fauntleroy*, 224 Ill. App. 3d 140, 149 (1991) (reference to evidence related to the defendant's arrest on an outstanding warrant was deemed admissible as part of narrative testimony regarding circumstances surrounding the arrest for the charged offense). Thus, even though evidence of the box cutter may have been admissible, it was not necessary to discuss the altercation in order to admit it.

¶ 33        We further find that no other exceptions to the other-crimes rule apply here. Contrary to the State's argument that the altercation proves the defendant's intent to harm Vicki, we cannot conclude that his mere presence at the train station the second time on October 8 demonstrated his intent to stalk Vicki. The version of the stalking statute under which the defendant was charged provides:

> "(a) A person commits stalking when he or she knowingly engages in a course of conduct directed at a specific person, and he or she knows or should know that this course of conduct would cause a reasonable person to:
>
>> (1) fear for his or her safety or the safety of a third person; or

(2) suffer other emotional distress." 720 ILCS 5/12-7.3(a) (West 2010).

Section 12-7.3(c) of the Code (720 ILCS 5/12-7.3(c) (West 2010)) also defines several relevant terms, including:

"(1) 'Course of conduct' means 2 or more acts, including but not limited to acts in which a defendant directly, indirectly, or through third parties, by any action, method, device, or means follows, monitors, observes, surveils, threatens, or communicates to or about, a person, engages in other non-consensual contact, or interferes with or damages a person's property or pet. A course of conduct may include contact via electronic communications.

* * *

(6) 'Non-consensual contact' means any contact with the victim that is initiated or continued without the victim's consent, including but not limited to being in the physical presence of the victim; appearing within the sight of the victim; approaching or confronting the victim in a public place or on private property; appearing at the workplace or residence of the victim; entering onto or remaining on property owned, leased, or occupied by the victim; or placing an object on, or delivering an object to, property owned, leased, or occupied by the victim." 720 ILCS 5/12-7.3(c) (West 2010).

¶ 34   We cannot conclude that the defendant's physical presence within Vicki's sight at the train station constituted "non-consensual contact" under the Code when there is no evidence that he knew she would be present at the time he returned from his interview on October 8. Moreover, the altercation did not tend to prove a fact in issue, such as identity or motive, of the stalking offense nor did it rebut an alibi or demonstrate a consciousness of guilt as to his earlier conduct with Vicki. See *Diaz*, 78 Ill. App. 3d at 279-80 (stating exceptions to rule barring other-crimes evidence include when evidence is relevant to establish time and place proximity, prove a fact in issue, rebut an alibi or demonstrate a consciousness of guilt). The defendant's identity and presence were undisputed; the nature of his contact with Vicki on October 4 and October 8 around 3 p.m. was the only disputed fact.

¶ 35   The State's reliance on *People v. Ranstrom*, 304 Ill. App. 3d 664 (1999), is also unpersuasive. In *Ranstrom*, the court determined that evidence of the defendant's numerous violations of orders of protection obtained by his ex-girlfriend was relevant in proving the State's theory that he was motivated by his obsession with the woman when he attacked her new boyfriend. *Id.* at 675. Unlike in *Ranstrom*, the defendant's stabbing of Christopher does not help establish whether his earlier conduct toward Vicki violated the stalking statute. Further, while the circuit court was correct that the indictment included the date of the altercation, it does not follow that the evidence is *per se* admissible. Thus, based on the record before us, we find that the circuit court abused its discretion when it granted the State's motion to admit the evidence of the altercation between the defendant and Christopher.

¶ 36   As the *Lindgren* court observed, improper admission of other-crimes evidence does not automatically require reversal if the error is deemed harmless. However, like in *Lindgren*, we find that the admission of the other-crimes evidence in this case was not harmless where its use was so pervasive during the defendant's trial that it nearly became unclear as to whether he was being tried for stalking Vicki or stabbing Christopher.

¶ 37    Evidence of the altercation did not come in merely through the questioning of a single witness like the arson evidence did in *Lindgren*. Instead, testimony about the altercation was adduced from Vicki, Christopher, Officer Demos, and the defendant. Additionally, the State specifically argued that Christopher did not press charges against the defendant for the stabbing, insinuating that the defendant should have or could have been charged with a crime related to the altercation. The jury was also shown the surveillance video depicting the altercation and photographs of the box cutter, the defendant's backpack, and Christopher's wound, and Christopher displayed his scar for the jury to view.

¶ 38    The evidence adduced at the defendant's trial went far beyond the reasons the State claimed it wanted to use the evidence; that is, to establish that the defendant continually stalked Vicki or possessed a weapon at her place of employment. We see no other reason for the evidence of the altercation with Christopher to be admitted other than to prove the defendant was a bad person deserving of punishment. Given the highly prejudicial nature of other-crimes evidence and the manner in which the State used the evidence in this case, we cannot find that the evidence did not contribute to the jury's verdict. We caution, as the court did in *Lindgren*, that our decision does not hold that the defendant is innocent. Rather, the stalking case boiled down to the credibility of the witnesses and credibility determinations are within the province of the jury, not the reviewing court. *Lindgren*, 79 Ill. 2d at 142. A jury may conclude, following a trial without the admission of the highly prejudicial evidence, that the State's witnesses are credible, but that is not our decision to make.

¶ 39    Although our decision effectively disposes of the case, we must also consider the defendant's insufficiency-of-the-evidence argument or else risk subjecting him to double jeopardy at a new trial upon remand. *People v. Bovio*, 118 Ill. App. 3d 836, 843 (1983). A judgment of conviction will not be reversed unless the evidence is so unsatisfactory or improbable that a reasonable doubt as to the guilt of the defendant remains. *Id.* As we stated earlier, the State's case rested on the credibility of its witnesses along with the weight to be placed upon the surveillance video of the defendant's October 8 interaction with Vicki. Vicki testified to the events of October 4 and October 8, 2010, stating that the defendant verbally threatened her, yelled obscenities at her, and menacingly pounded on the glass window of her kiosk. The October 8 surveillance video recorded her interaction with the defendant, and Officer Conley testified that the defendant admitted calling Vicki a "bitch" on October 4. If an uncontaminated jury finds the State's witnesses to be credible, the evidence would be sufficient to prove the defendant guilty of stalking beyond a reasonable doubt. *Id.* ("it is within the province of the jury to determine the credibility of witnesses").

¶ 40    Having concluded that the erroneous admission of other-crimes evidence warrants a new trial in this case, we need not address the defendant's remaining argument pertaining to Rule 431(b).

¶ 41    Based on the foregoing reasons, we reverse the judgment of the circuit court of Cook County and remand the cause for a new trial.

¶ 42    Reversed and remanded.