Rule 23 order filed
February 25, 2015;
Motion to publish granted
March 31, 2015.

2015 IL App (5th) 140105

NO. 5-14-0105

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| DUANE HASSEBROCK and<br>EVELYN HASSEBROCK, | ) <br> ) <br> ) | Appeal from the<br>Circuit Court of<br>Marion County. |
| Plaintiffs-Appellants, | ) <br> ) | |
| v. | ) <br> ) | No. 11-L-47 |
| DEEP ROCK ENERGY CORPORATION, | ) <br> ) | Honorable<br>Michael D. McHaney, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

JUSTICE SCHWARM delivered the judgment of the court, with opinion.
Presiding Justice Cates and Justice Chapman concurred in the judgment and opinion.

**OPINION**

¶ 1                                    BACKGROUND

¶ 2     In October 1999, the plaintiff, Duane Hassebrock,[1] and the defendant, Deep Rock Energy Corporation, as the owners of several Marion County oil and gas leases covering

_____

[1]The record indicates that Duane's wife, Evelyn, is a named party in this case because in January 2011, Duane assigned to her half of his interest at issue. In the proceedings below, the defendant disputed whether Duane's assignment to Evelyn had ever been properly recorded and noticed. It is undisputed, however, that Evelyn was not

1

various tracts of land south of Stephen A. Forbes State Park (the Omega leases), entered into a letter agreement with Ceja Corporation (Ceja), an oil and gas exploration and development company headquartered in Tulsa, Oklahoma. Under the terms of the letter agreement, Ceja agreed to perform a seismic survey of the land covered by the Omega leases in exchange for a 25% working interest in the leases. The agreement further provided that should the results of the seismic survey warrant drilling and development on the Omega leases, Ceja would operate the wells, and the parties would enter into a separate agreement regarding Ceja's operations.

¶ 3    It is undisputed that the parties never entered into an operating agreement with respect to the Omega leases. It is further undisputed that the defendant later obtained numerous oil and gas leases to various tracts of land in and around Stephen A. Forbes State Park (the Forbes leases) and that the defendant and Ceja developed working oil wells pursuant to those leases, without the plaintiff.

¶ 4    In May 2002, the plaintiff filed a "Notice of Claim of Interest" with the Marion County clerk and recorder of records (the notice). The notice alleged that the plaintiff had a claim of interest in the Forbes leases and specifically named the defendant and Ceja as parties to the notice. Further alleging that the plaintiff, the defendant, and Ceja had

a party to the events underlying the present cause of action against the defendant and that her status as interest-holder is not relevant to any of the issues on appeal. For simplicity, we will thus refer to Duane as "the plaintiff" and to his and Evelyn's combined interest as his interest.

entered into a joint venture agreement with respect to the Omega leases and the Forbes leases (the venture agreement), the notice suggested that the defendant and Ceja had violated the terms of the venture agreement by not giving the plaintiff his proportional interest in the Forbes leases, as "was understood and agreed between all joint venture members."

¶ 5    In Marion County case number 02-MR-63, the defendant subsequently sued the plaintiff to remove the notice as a cloud on its title to the Forbes leases.  The plaintiff, in turn, filed a counterclaim against the defendant seeking to enforce the alleged terms of the venture agreement.

¶ 6    On December 3, 2004, the plaintiff and the defendant entered into a settlement agreement resolving their respective disputes in No. 02-MR-63 (the settlement agreement).  Pursuant to the terms of the settlement agreement, the plaintiff and the defendant released each other from all claims arising from the venture agreement, and the defendant gave the plaintiff $2.5 million.  The plaintiff also assigned to the defendant all of his right, title, and interest in and to the Forbes leases, and the defendant assigned to the plaintiff a 1% carried working interest in the "oil produced and saved" from the leases.  Notably, the defendant's assignment to the plaintiff did not require the defendant to directly pay the plaintiff on his 1% interest.

¶ 7    In February 2011, in the circuit court of St. Clair County, the plaintiff filed a complaint against the defendant alleging that it had breached the terms of the settlement agreement by failing to pay him for his entire 1% interest in the oil harvested from the

Forbes leases. The plaintiff subsequently filed a first amended complaint alleging additional counts against Ceja for breaching the terms of the venture agreement.

¶ 8 In March 2011, the defendant and Ceja filed motions to transfer venue from St. Clair County to Marion County. In July 2011, the circuit court of St. Clair County granted the motions, and the cause was transferred to Marion County, where it was assigned case number 11-L-47.

¶ 9 In September 2011, arguing that the plaintiff's claims regarding the venture agreement were improperly joined with his claims regarding the settlement agreement, Ceja filed a motion to dismiss the counts against it and to dismiss it as a party in No. 11-L-47. At the same time, with respect to the plaintiff's claims against the defendant, the defendant filed a motion to dismiss the plaintiff's first amended complaint as improperly pled (see 735 ILCS 5/2-615 (West 2012)). In November 2011, finding that the plaintiff's attempted joinder of Ceja was improper under the circumstances, the trial court granted Ceja's motion to dismiss. The trial court also granted the defendant's motion to dismiss and granted the plaintiff leave to file a second amended complaint.

¶ 10 The plaintiff subsequently filed a second amended complaint that again combined his claims against the defendant and Ceja. In his second amended complaint, the plaintiff alleged, among other things, that in addition to failing to pay him for his entire 1% interest in the oil harvested from the Forbes leases, the defendant had also failed to pay him his entire 1% interest in the gas harvested from the leases. The defendant and Ceja again responded with motions to dismiss. In one of its motions, the defendant argued that the plaintiff's allegation that he was entitled to a 1% interest in the gas harvested from the

4

Forbes leases should be stricken because under the terms of the settlement agreement, the plaintiff had never been given such an interest.

¶ 11   In February 2012, stating that the plaintiff's cause of action against the defendant was "separate and distinct" from his cause of action against Ceja, the trial court entered an order striking all references to Ceja and the venture agreement from the plaintiff's second amended complaint.  Noting that the defendant's assignment to the plaintiff did not include a working interest in any gas harvested from the Forbes leases, the court also struck the plaintiff's allegation that he was entitled to a 1% interest in any such gas.

¶ 12   The plaintiff subsequently filed a third amended complaint that again combined his claims against the defendant and Ceja.  In response, the defendant and Ceja filed motions to dismiss the third amended complaint for failure to comply with the trial court's previous order.  In June 2012, noting that−although the plaintiff's third amended complaint did not reallege that he was entitled to a 1% interest in the gas harvested from the Forbes leases−the complaint was "virtually identical" to his second, the trial court granted the motions to dismiss and ordered that the plaintiff's causes of action against the defendant and Ceja be severed.  In September 2012, after denying the plaintiff's motion to reconsider, the trial court entered an order formally severing the causes of actions, and the plaintiff's case against Ceja was assigned case number 12-L-56.

¶ 13   The plaintiff subsequently filed a fourth amended complaint against the defendant, realleging that the defendant had failed to pay him the full amounts owed him on his 1% interest in the oil produced from the Forbes leases.  The defendant moved to dismiss the fourth amended complaint, asserting that under the terms of the settlement agreement, it

was not responsible for paying the plaintiff any amounts due on his 1% interest. In October 2012, construing the defendant's motion to dismiss the plaintiff's fourth amended complaint as a motion to dismiss pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2012)), the trial court entered an order stating that the plaintiff had failed to plead any facts supporting its conclusion that the defendant was required to pay the plaintiff "any sum of money regarding the one percent (1%) carried working interest." The court noted that the settlement agreement required the defendant to pay the plaintiff $2.5 million and to merely assign the 1% interest. The court thus granted the defendant's motion to dismiss and granted the plaintiff leave to file an amended complaint.

¶ 14    In November 2012, the plaintiff filed his fifth and final amended complaint. The complaint was substantially similar to the plaintiff's previous complaint and again alleged that the defendant had breached the terms of the settlement agreement by failing to pay him the full amounts due on his 1% interest. The record indicates that in November 2012, the plaintiff also mailed the defendant a discovery request in the form of a "First Request for Production of Documents and First Interrogatories," a copy of which is not included in the record on appeal.

¶ 15    In December 2012, the defendant filed a motion for summary judgment (see 735 ILCS 5/2-1005 (West 2012)), arguing that in light of the trial court's previous determination that the defendant was not obligated to make payments to the plaintiff on his 1% interest, the defendant was entitled to judgment in its favor as a matter of law. The defendant also filed a motion for extension of time to respond to the plaintiff's

discovery request. On January 7, 2013, the plaintiff filed a motion in opposition to the defendant's request for summary judgment, in which he noted that the defendant had yet to respond to his discovery request. The record indicates that on January 9, 2013, the defendant mailed the plaintiff its response to his "First Request for Production of Documents and First Interrogatories."

¶ 16 In April 2013, the cause proceeded to a hearing on the defendant's motion for summary judgment, where the defendant reiterated its position that it was not obligated to pay the plaintiff any money on the 1% interest that had been assigned to him pursuant to the settlement agreement. The defendant maintained that while the plaintiff's right to receive money from the proceeds of the oil harvested from the Forbes leases arose from the assignment, the defendant was not responsible for ensuring that such money be paid. In response, the plaintiff complained that there had been "absolutely no discovery" and that there was "no affidavit in support of [the defendant's] motion." The plaintiff asserted that whether the defendant was somehow involved in divvying up the money at issue was therefore unknown.

¶ 17 In May 2013, the trial court entered a docket-entry order denying the defendant's motion for summary judgment, stating that the plaintiff had pled a sufficient cause of action for breach of contract. The order further stated that if after discovery, the defendant established that the plaintiff had received all monies due on his 1% interest or that some other entity was responsible for making the payments, the defendant could then request that summary judgment be entered in its favor.

¶ 18  In June 2013, the defendant filed an answer and a first defense to the plaintiff's fifth amended complaint, and the parties deposed Ellen Cassidy, a paralegal title analyst employed by Bi-Petro, Inc., a crude oil purchaser headquartered in Springfield. Cassidy testified that she was familiar with Bi-Petro's purchasing practices and that Bi-Petro was the "first purchaser" of the oil harvested from the Forbes leases. See 765 ILCS 520/10(b) (West 2012). She further testified that Bi-Petro directly distributes the proceeds of its purchases of the oil harvested from the Forbes leases and "physically" makes the payments to the leases' numerous interest-holders, including the plaintiff. Cassidy indicated that on one occasion in 2006, however, the defendant had directly distributed funds earned from the sale of oil from the Forbes leases. She further indicated that there had otherwise never been an agreement under which the defendant had assumed that responsibility. Cassidy stated that the defendant had nothing "to do with computing the amounts of money that Bi-Petro pays to the various interest[-]holders, including [the plaintiff]." Cassidy produced numerous division orders, distribution reports, and 1099 forms collectively showing that from 2004 through 2012, Bi-Petro had paid the plaintiff nearly $1.1 million on his 1% interest in the Forbes leases. Cassidy testified that Bi-Petro was not holding any funds in escrow that would otherwise be payable to the plaintiff and that to the best of her knowledge, the plaintiff had been paid all amounts due him on his 1% interest. Cassidy stated that she was not aware of any agreement between Bi-Petro and the defendant with respect to the Forbes leases, other than their original sales contract, but that Bi-Petro's vice president would know if any other agreements existed. Cassidy indicated that the plaintiff's attorney had never requested that Bi-Petro provide

him with any information regarding the oil proceeds from the Forbes leases but that she would be able to provide the plaintiff's attorney with a copy of the defendant's sales contract with Bi-Petro if requested. Cassidy stated that she did not know if Bi-Petro purchased all of the crude oil produced by the defendant, noting that the defendant "could have wells that they're selling to other companies." Cassidy testified that Bi-Petro does not purchase natural gas. The record indicates that in addition to a copy of the deposition, the plaintiff was also provided with copies of all of the documents referred to at the deposition.

¶ 19 On August 12, 2013, the defendant filed objections to the plaintiff's "second set of interrogatories," claiming that they pertained to natural gas and that the plaintiff had not been assigned any interest in gas. A copy of the second set of interrogatories is not included in the record on appeal. On August 21, 2013, the defendant's president, Ben Webster, executed an affidavit attesting, among other things, that "[a]t all times during and subsequent to December 3, 2004, all of the oil produced from the [Forbes leases had been] purchased by Bi-Petro, Inc." Webster further attested that the defendant "has nothing to do with the computation of the amounts paid by Bi-Petro, Inc.[,] to the various interest[-]holders" of the Forbes leases. Webster indicated that on one occasion in 2006, the defendant had distributed the proceeds of oil produced from the Forbes leases because of a pending title dispute but had otherwise never agreed to distribute such funds. Webster further indicated that after the title dispute had been settled, the defendant had paid the plaintiff his 1% share of the remaining proceeds. Webster attested that "[t]he only other arguable proceeds from oil produced from the [Forbes leases was] money

9

derived from marketable oil extracted from tank bottoms amounting to a total of $7,524.47." Webster did not believe that the plaintiff was entitled to a 1% share of those funds, however, as they had "been treated as a credit to the cost[-]bearing interest[-]holders as a partial reimbursement for the cost of disposing of the tank bottoms."

¶ 20 On August 27, 2013, the defendant filed a second motion for summary judgment, which included, among other things, a transcript of Cassidy's deposition, copies of the documents referred to at her deposition, and a copy of Webster's affidavit. Arguing that there was no material question of fact regarding whether the defendant was obligated to pay the plaintiff on his 1% interest in the Forbes leases, the motion alleged that Bi-Petro had been the only purchaser of the oil harvested from the leases and that other than the one occasion involving the 2006 title dispute, the defendant had never assumed the responsibility of distributing the proceeds from its sales of the oil.

¶ 21 In September 2013, the plaintiff filed a motion in opposition to the defendant's second motion for summary judgment. Referencing Cassidy's acknowledgment that she did not know if Bi-Petro purchased all of the crude oil produced by the defendant, the plaintiff argued that it was not clear whether Bi-Petro was the only purchaser of the oil harvested from the Forbes leases. Referencing Cassidy's acknowledgment that she did not know if the defendant and Bi-Petro had entered into any agreements other than their original sales contract, the plaintiff further argued that he had not "been afforded the opportunity to explore all of the agreements between [the defendant] and Bi-Petro, as well as any additional possible agreement between [the defendant] and others who are purchasing oil from [the Forbes leases]." Asserting that he had 1% interest in the natural

10

gas harvested from the Forbes leases, the plaintiff also complained that the defendant had "refused to respond to [his] discovery requests associated with this issue."

¶ 22    On October 1, 2013, the trial court held a hearing on the defendant's second motion for summary judgment.  At the hearing, referencing Webster's "uncontradicted affidavit *** that Bi-Petro is the only buyer of the oil produced from [the Forbes leases]," the defendant argued that although it had "other wells" that produced oil that was sold to purchasers other than Bi-Petro, those wells were "not involved in this lawsuit."  The defendant further acknowledged that although it had proven that the plaintiff had not been denied any payments due on his 1% interest, there arguably remained a question of fact as to whether the plaintiff was entitled to a 1% share of the $7,524.47 obtained from the sale of the "salvaged oil" that had been extracted from the tank bottoms during the drilling process.  The defendant thus suggested that its motion for summary judgment be treated as a motion for summary judgment as to the "major issue rather than a summary judgment for the whole thing."  In response, the plaintiff maintained that even assuming that Bi-Petro was the only purchaser of the oil harvested from the Forbes leases, the defendant "still may owe [him] money for the gas."[2]  The plaintiff also complained that the defendant had failed to comply with his discovery requests.

---

[2]The record indicates that at some point, natural gas had been harvested from the Forbes leases.  Because the associated expenses "became so overwhelming," however, the practice "wasn't economically feasible" and was thus apparently discontinued.

11

¶ 23    In a letter dated October 3, 2013, the defendant's attorney wrote the trial court clarifying the defendant's arguments and reiterating its position regarding the possible entry of an order granting partial summary judgment. The letter was accompanied by a proposed order and a copy of the statute governing summary judgments (735 ILCS 5/2-1005 (West 2012)). It is undisputed that the defendant's attorney failed to contemporaneously forward a copy of the correspondence and proposed order to the plaintiff's attorney.

¶ 24    On October 7, 2013, using the defendant's proposed order, the trial court granted partial summary judgment in favor of the defendant. The court determined that under the terms of the settlement agreement, the defendant was not obligated to pay the plaintiff on his 1% interest in the oil harvested from the Forbes leases and that the defendant's assignment to the plaintiff "did not carry with it any interest in gas." The court also noted that by statute, Bi-Petro was responsible for distributing the proceeds derived from its oil purchases. The court further determined that "with two exceptions," Bi-Petro had paid the leases' interest-holders their shares of monies obtained from the sales of the harvested oil. The court identified the two exceptions as the aforementioned occasion involving the 2006 "title dispute" and the defendant's sale of the "salvaged oil" referenced in Webster's affidavit. Refusing to grant summary judgment with respect to those exceptions, the court stated that there may be remaining questions of fact as to whether the defendant had properly distributed the funds following the title dispute and whether the plaintiff was entitled to any of the proceeds from the sale of the salvaged oil.

12

¶ 25　In an accompanying docket entry, observing that it appeared that the plaintiff had not been provided with a copy of the defendant's letter to the court, the court directed the circuit clerk to send the plaintiff's attorney a copy of the letter along with a copy of the order granting partial summary judgment. Indicating that the letter had not influenced the court's ruling, the docket entry further noted that the letter was a summation of the defendant's arguments and did not include anything that had not already been addressed. The record indicates that the defendant's attorney subsequently also sent the plaintiff's attorney a copy of the correspondence to the court, accompanied by a letter explaining that his failure to previously do so had been unintentional.

¶ 26　In a letter dated October 22, 2013, the plaintiff's attorney advised the defendant's attorney that he suspected that the defendant "never intended" to provide the plaintiff with a copy of its letter to the court until after the order granting partial summary judgment had been entered. The plaintiff further indicated that it would be moving to vacate the trial court's judgment order in light of the *ex parte* communication.

¶ 27　On October 23, 2013, the plaintiff filed a motion to vacate the trial court's order granting partial summary judgment in light of the defendant's *ex parte* communication with the court. As an appendix, the motion to vacate included a copy of the plaintiff's October 22, 2013, correspondence to the defendant's attorney.

¶ 28　At a hearing held December 17, 2013, the plaintiff's motion to vacate the trial court's order granting partial summary judgment was addressed. Plaintiff's counsel argued that whether the defendant's failure to provide him with a copy of the October 3, 2013, correspondence had been "a mistake or not," the correspondence was nonetheless

13

an improper *ex parte* communication to which the plaintiff was entitled to respond. Without objection, the trial court agreed, vacated its previously entered order, and stated that it would give the plaintiff whatever time he deemed necessary to prepare a response.

¶ 29    On December 27, 2013, the trial court entered an order granting the defendant's motions to dismiss the plaintiff's case against Ceja in No. 12-L-56.   The plaintiff subsequently filed a timely notice of appeal in No. 12-L-56.

¶ 30    On January 14, 2014, the plaintiff filed a surreply in opposition to the defendant's second motion for summary judgment in the present case, which was virtually identical to his September 2013 pleading in opposition to the motion.   The record indicates that on February 19, 2014, the trial court held a final hearing on "[a]ll pending motions" in the case.   Notably, a transcript of the proceedings is not included in the record on appeal.

¶ 31    On February 25, 2014, the trial court entered a written order reinstating its previously vacated order granting partial summary judgment in favor of the defendant.   In the order, the court specifically stated that its judgment was "[b]ased solely on the record and [the] case law submitted."   After making an express written finding that there was no just reason for delaying either enforcement or appeal of the judgment pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010), the trial court further stated, without elaboration, that it was recusing itself from all future proceedings in the instant case and in the plaintiff's case against Ceja in No. 12-L-56. On March 7, 2014, the plaintiff filed a timely notice of appeal.

¶ 32                              DISCUSSION

¶ 33   On appeal, the plaintiff argues that the trial court erred in granting partial summary judgment in favor of the defendant. The plaintiff maintains that doubts remain as to whether Bi-Petro is the only purchaser of the oil harvested from the Forbes leases and whether the defendant and Bi-Petro have ever entered into agreements with respect to the leases other than their original sales contract. He further maintains that the trial court erroneously concluded that his assigned 1% interest in the leases did not include any interest in natural gas. The plaintiff also suggests that it was improper for the trial court to enter judgment in the defendant's favor and then recuse itself without stating why.

¶ 34                         Plaintiff's Statement of Facts

¶ 35   At the outset, the defendant complains that the plaintiff's statement of facts violates Illinois Supreme Court Rule 341(h)(6), which requires that an appellant's brief include a statement of facts "which shall contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal." Ill. S. Ct. R. 341(h)(6) (eff. Feb. 6, 2013). The defendant argues that the plaintiff's statement of facts is argumentative, includes few citations to the record, and further includes numerous assertions that "are not even in the record at all." We agree and will accordingly ignore those portions of the plaintiff's brief that fail to comply with Rule 341(h)(6). See *Aboufariss v. City of De Kalb*, 305 Ill. App. 3d 1054, 1058 (1999); *Finance America Commercial Corp. v. Econo Coach, Inc.*, 95 Ill. App. 3d 185, 186 (1981).

15

¶ 36                    Summary Judgment and Standards of Review

¶ 37  "A motion for summary judgment should only be granted when the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  *Jackson v. TLC Associates, Inc.*, 185 Ill. 2d 418, 423 (1998).  "The purpose of summary judgment is not to try a question of fact, but to determine if one exists."  *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335 (2002).  "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt."  *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992).  "Although a plaintiff is not required to prove his case at the summary judgment stage, in order to survive a motion for summary judgment, the nonmoving party must present a factual basis that would arguably entitle the party to a judgment."  *Robidoux*, 201 Ill. 2d at 335.  Our review of a trial court's order granting summary judgment is *de novo*.  *Outboard Marine Corp.*, 154 Ill. 2d at 102.  The interpretation of a settlement agreement or assignment, both of which are governed by contract principles, is a matter of law that we also review *de novo*.  *Blum v. Koster*, 235 Ill. 2d 21, 33 (2009); *Cincinnati Insurance Co. v. American Hardware Manufacturers Ass'n*, 387 Ill. App. 3d 85, 99 (2008).

¶ 38                                Gas

¶ 39  The plaintiff suggests that the trial court erroneously determined that the assignment he obtained pursuant to the terms of the settlement agreement did not include an interest in any natural gas harvested from the Forbes leases.  Noting that the assignment and settlement agreement are fraught with references to "oil and gas," the

16

plaintiff contends that although "the assignment itself only references a working interest in 'oil produced,' *** the parties clearly contemplated both oil and natural gas." We disagree.

¶ 40 "The cardinal rule of contract interpretation is to discern the parties' intent from the contract language." *Buenz v. Frontline Transportation Co.*, 227 Ill. 2d 302, 308 (2008). "Where the contract language is unambiguous, it should be given its plain and ordinary meaning." *Id.*

¶ 41 Here, the defendant's assignment to the plaintiff assigned "a one percent (1%) carried working interest more particularly described below in and to [the Forbes leases]." The assignment then specifically states:

> "The carried working interest herein assigned shall entitle [the plaintiff] to receive one percent (1%) of the working interest oil produced and saved from [the Forbes leases] free and clear of all costs and expenses for drilling, completion[,] and operation to the tank, but subject to all existing royalty and overriding royalty obligations."

The assignment further states that the plaintiff's "sole right shall be to receive money attributable to one percent (1%) of the proceeds of working interest oil produced and sold from [the Forbes leases]." We note that the assignment also specifically references "oil," "oil wells," and "wells producing oil," while the term "gas" only appears when describing the Forbes leases as "oil and gas leases."

¶ 42 "In construing a contract, the court's primary objective is to ascertain and give effect to the parties' intent as evidenced by the plain language used in the agreement."

17

*Hannafan & Hannafan, Ltd. v. Bloom*, 2011 IL App (1st) 110722, ¶ 17. Here, although the assignment and settlement agreement refer to the Forbes leases as "oil and gas leases," the assignment's plain and unambiguous language granted the plaintiff a 1% interest in the "oil produced" from the Forbes leases but did not grant him any interest in natural gas. The trial court thus properly entered summary judgment in favor of the defendant on this issue.

¶ 43                                    Oil

¶ 44    As previously noted, when granting the defendant's motion for partial summary judgment, the trial court determined that under the terms of the settlement agreement, the defendant was not obligated to directly pay the plaintiff on his 1% interest in the oil harvested from the Forbes leases and that with two exceptions, Bi-Petro, as the first purchaser of the harvested oil, had paid the leases' interest-holders their shares of the monies obtained from the sales of the oil. On appeal, the plaintiff argues that the trial court erred in entering summary judgment in favor of the defendant with respect to this issue because doubts remain as to whether Bi-Petro is the only purchaser of the oil harvested from the Forbes leases and whether "other agreements" between the defendant and Bi-Petro exist. He further complains that the trial court "should have permitted [him] to conduct at least some discovery on this issue prior to granting summary judgment."

¶ 45    As he did below, in support of his contentions that doubts remain, the plaintiff references Cassidy's testimony that she did not know if Bi-Petro purchased all of the crude oil produced by the defendant and that she was not aware if Bi-Petro and the defendant had entered into "any other written agreements" other than the original sales

18

contract pertaining to the Forbes leases. The plaintiff ignores, however, that Webster's uncontradicted affidavit established that all of the oil produced *from the Forbes leases* has been purchased by Bi-Petro and that "courts must accept an affidavit as true if it is uncontradicted by counteraffidavits or other evidentiary materials." *F.H. Paschen/S.N. Nielsen, Inc. v. Burnham Station, L.L.C.*, 372 Ill. App. 3d 89, 92-93 (2007). The plaintiff further ignores that his suggestion that Bi-Petro and the defendant might have entered into agreements pertaining to the Forbes leases other than their original sales contract is pure speculation, and "speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). "A defendant moving for summary judgment bears the initial burden of proof" (*Lewis v. Chica Trucking, Inc.*, 409 Ill. App. 3d 240, 251 (2011)), and a defendant may meet that burden "by establishing 'that there is an absence of evidence to support the nonmoving party's case' " (*Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)); see also *Village of Palatine v. Palatine Associates, LLC*, 406 Ill. App. 3d 973, 978-79 (2010)). Moreover, the record indicates that Bi-Petro's payments to the plaintiff have always stemmed from the original sales agreement.

¶ 46    Under the terms of the settlement agreement, the defendant assigned the plaintiff a 1% interest in the oil harvested from the Forbes leases but did not assume the responsibility of paying the plaintiff any monies due on his interest. Moreover, as the trial court observed below, by statute, the "first purchaser" of oil is obligated to make payments to those entitled to the proceeds from any sales, unless the first purchaser and

19

the owner of the right to produce the oil have entered into an arrangement by which the owner assumes the responsibility of making the payments.[3] 765 ILCS 520/10(a), (b) (West 2012). On appeal, the plaintiff asserts that he "brought suit merely to ensure that [he is] being paid [his] full one percent for all of the oil harvested under the [Forbes] leases." As the defendant maintains, however, the plaintiff has "made no showing whatsoever that the amounts paid to [him] by Bi-Petro are incorrect" or "incomplete" or "do not account for all of the oil produced from the subject oil wells," other than the two exceptions described in the trial court's order. We agree, and we cannot conclude that the court erred in granting the defendant's motion for partial summary judgment.

¶ 47 On appeal, the plaintiff suggests that he was denied the opportunity to conduct discovery with respect to these matters and that the trial court thus prematurely granted the defendant's motion for summary judgment. This claim is not supported by the record, however, and is also forfeited.

¶ 48 The record indicates that the plaintiff never requested that Bi-Petro provide him with any information regarding the sales of the oil from the Forbes leases in addition to that which the defendant apparently tendered. It further appears that the plaintiff made

---

[3]We note that Cassidy and Webster both indicated that such an arrangement had been made with respect to the one occasion in 2006 when the defendant had directly distributed funds earned from the sale of oil from the Forbes leases. They also stated that there had never been any other agreements under which the defendant had assumed that responsibility.

no efforts to depose Webster or Bi-Petro's vice president. The plaintiff argues that the defendant did not "fully comply" with his discovery requests, but as previously noted, none of his discovery requests are included in the record on appeal. The record also indicates that the only request that the defendant objected to was the plaintiff's second set of interrogatories, which apparently pertained to natural gas. In any event, at the hearing on the defendant's second motion for summary judgment, although the plaintiff complained about a lack of discovery and intimated that he wanted to depose Webster, he never requested a continuance, nor did he ever file an affidavit pursuant to Illinois Supreme Court Rule 191(b) (eff. Jan. 4, 2013) attesting that he needed to conduct additional discovery in order to respond to the defendant's request for summary judgment. As a result, the plaintiff has "forfeited any argument that the granting of the summary judgment motion in this case was premature." *Kleiber v. Freeport Farm & Fleet, Inc.*, 406 Ill. App. 3d 249, 261 (2010); see also *Cordeck Sales, Inc. v. Construction Systems, Inc.*, 382 Ill. App. 3d 334, 377 (2008) ("As a rule, a party cannot argue on appeal that a summary judgment order must be reversed because it required additional discovery if it failed to request additional discovery and attach a Rule 191(b) affidavit to its summary judgment pleadings."); *Giannoble v. P&M Heating & Air Conditioning, Inc.*, 233 Ill. App. 3d 1051, 1064 (1992) ("Failure to comply with Rule 191(b) defeats an objection on appeal that insufficient time for discovery was allowed.").

¶ 49                                    The Trial Court's Recusal

¶ 50    Although not specifically raised as an argument (see *Vancura v. Katris*, 238 Ill. 2d 352, 370 (2010)), in the present appeal and on appeal from the trial court's judgment in

21

his case against Ceja in No. 12-L-56, the plaintiff seemingly takes issue with the timing of the trial court's recusal. The plaintiff maintains that the trial court's decision to recuse itself after entering judgment in the present case and in No. 12-L-56, without explanation, is "curious[ ]" and "strange[ ]." At oral argument, plaintiff's counsel suggested that the trial court acted inappropriately. We note that the defendant's attorney was and is also Ceja's attorney, and that the plaintiff is and has been represented by the same attorney in the instant case and in No. 12-L-56.

¶ 51 Pursuant to Illinois Supreme Court Rule 63(C)(1), "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned," including instances where "the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding." Ill. S. Ct. R. 63(C)(1)(a) (eff. July 1, 2013). Additionally, "Rule 63(C)(1)'s direction to judges to voluntarily recuse themselves where their 'impartiality might reasonably be questioned' [citation] includes 'situations involving the appearance of impropriety.' " *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 43. Rule 63 does not mandate that a trial court state its reason for recusal on the record or in its recusal order, unless the court seeks a waiver of its disqualification. See Ill. S. Ct. R. 63(C), (D) (eff. July 1, 2013).

¶ 52 "Whether a judge should recuse himself is a decision in Illinois that rests *exclusively within the determination of the individual judge*, pursuant to the canons of judicial ethics found in the Judicial Code." (Emphasis in original.) *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 45. Nevertheless, "under existing law, a party may seek

relief on appeal on the alternative ground that a trial judge should have recused himself or herself under Rule 63(C)(1)." *Id.* ¶ 147 (Karmeier, J., specially concurring). "When reviewing a trial judge's recusal decision, we must determine whether the decision was an abuse of the judge's discretion." *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163, 175 (2008).

¶ 53    Here, to the extent that the plaintiff suggests that the timing of the trial court's recusal should be viewed as an indication of possible bias, "[a]llegations of judicial bias must be viewed in context and should be evaluated in terms of the trial judge's specific reaction to the events taking place." *People v. Jackson*, 205 Ill. 2d 247, 277 (2001). Here, the circumstances suggest that the trial court's decision to recuse itself might have stemmed from its *ex parte* communication with the defendant's attorney, even though it is undisputed that the trial court properly dealt with the situation. See *Kamelgard v. American College of Surgeons*, 385 Ill. App. 3d 675, 680 (2008) ("Under Rule 63, the judge who participates in an *ex parte* communication must make 'provision promptly to notify all other parties of the substance of the *ex parte* communication and allow[ ] an opportunity to respond.' [Citation.]"). As noted above, in its order reinstating its previously vacated order granting partial summary judgment, the court specifically stated that its judgment was "[b]ased solely on the record and [the] case law submitted," which would be a reasonable response to a suggestion that its judgment had been improperly influenced by the letter from the defendant's attorney. It is equally plausible that the court's recusal resulted from a personal bias against one or both of the parties that did not exist when it initially entered its judgment order. In the absence of an explanation from

the trial court and without a transcript of the proceedings immediately preceding its recusal, however, we can only speculate. Nevertheless, we cannot conclude that the timing of the court's recusal alone suggests judicial bias or otherwise creates an appearance of impropriety warranting a reversal of the court's judgment.

¶ 54    "It is well settled that an appellant bears the burden of preserving a sufficient record for review and any doubts arising from an incomplete record will be resolved against the appellant." *People v. Ranstrom*, 304 Ill. App. 3d 664, 672 (1999). "When the record presented on appeal is incomplete, this court will indulge in every reasonable presumption favorable to the judgment from which the appeal is taken, including that the trial court ruled or acted properly." *Id.* "Trial judges are presumed to be fair and impartial," and "[a] party alleging judicial bias must overcome this presumption." *Lesher v. Trent*, 407 Ill. App. 3d 1170, 1176 (2011). Moreover, to properly assess whether an appearance of impropriety warranted a judge's recusal, a reviewing court must know and understand all of the relevant facts. *People v. Buck*, 361 Ill. App. 3d 923, 932 (2005).

¶ 55    Here, the trial court was in the best position to determine whether it needed to recuse itself (*Kamelgard*, 385 Ill. App. 3d at 681), and "it is precisely in situations such as this, where the cold record suggests an apparent contradiction, that we defer to the circuit court's discretion" (*People v. Shaw*, 186 Ill. 2d 301, 317 (1998)). Moreover, although all of the facts surrounding the trial court's recusal are unclear, nothing suggests that the court's judgment was based on anything other than the evidence presented for its consideration. See *Kamelgard*, 385 Ill. App. 3d at 683; *Bauer v. Memorial Hospital*, 377 Ill. App. 3d 895, 912 (2007).

24

¶ 56    Under the circumstances, we conclude that the plaintiff has failed to overcome the presumption that the trial court was fair and impartial. We further conclude that the timing of the trial court's recusal does not in and of itself create an appearance of impropriety warranting a reversal of its judgments. We also note that the record does not indicate that the plaintiff ever sought clarification of the trial court's unexplained recusal, so the court has not been afforded an opportunity to formally address the matter. Lastly, although nothing suggests that the trial court's judgments were improperly influenced, because all of the issues raised in the plaintiff's present appeals are reviewed *de novo*, "we perform the same analysis a trial court would perform and give no deference to the judge's conclusions or specific rationale." *Bituminous Casualty Corp. v. Iles*, 2013 IL App (5th) 120485, ¶ 19. "The term '*de novo*' means that the court reviews the matter anew–the same as if the case had not been heard before and as if no decision had been rendered previously." *Ryan v. Yarbrough*, 355 Ill. App. 3d 342, 346 (2005).

¶ 57                                    CONCLUSION

¶ 58    For the foregoing reasons, the trial court's judgment granting partial summary judgment in favor of the defendant is hereby affirmed.


¶ 59    Affirmed.

25

2015 IL App (5th) 140105

NO. 5-14-0105

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

DUANE HASSEBROCK and                    )    Appeal from the
EVELYN HASSEBROCK,                       )    Circuit Court of
                                         )    Marion County.
    Plaintiffs-Appellants,               )
                                         )
v.                                       )    No. 11-L-47
                                         )
DEEP ROCK ENERGY CORPORATION,            )    Honorable
                                         )    Michael D. McHaney,
    Defendant-Appellee.                  )    Judge, presiding.
_____

**Rule 23 Order Filed:**      February 25, 2015
**Motion to Publish Granted:**  March 31, 2015
**Opinion Filed:**           March 31, 2015
_____

**Justices:**         Honorable S. Gene Schwarm, J.

                Honorable Judy L. Cates, P.J., and
                Honorable Melissa A. Chapman, J.,
                Concur

_____

**Attorneys**      Joseph A. Bartholomew, Stephanie A. Brauer, Cook, Ysursa,
**for**           Bartholomew, Brauer & Shevlin, Ltd., 12 West Lincoln Street,
**Appellants**    Belleville, 62220

_____

**Attorney**       George C. Lackey, Lackey & Stevenson, P.C., 331 East Broadway,
**for**           P.O. Box 808, Centralia, IL 62801
**Appellee**

_____