2022 IL App (1st) 200800-U

No. 1-20-0800

Order filed May 5, 2022

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* ESTATE OF WILLIAM HARRIS SMITH, Deceased, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| (CONGREGATION BETH TEFILLAH, | ) ) | |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16 P 4247 |
| ZACHARY SMITH, as Independent Administrator, | ) ) ) | Honorable Daniel P. Malone, |
| Defendant-Appellant.) | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Reyes and Justice Martin concurred in the judgment.

**ORDER**

¶ 1     *Held*:  (1) The trial court did not abuse its discretion by denying defendant's motions to bar the testimony of plaintiff's witnesses based on alleged violations of the Dead-Man's Act (735 ILCS 5/8-201 (West 2020)), and witness disclosure rules; and (2) Plaintiff, a non-profit religious congregation, met its burden to establish consideration for the decedent's gratuitous pledge, which pledge was converted into a valid and enforceable contract before the pledge was withdrawn because plaintiff used a portion of the decedent's donation to purchase land and the decedent's pledge induced pledges from other donors.

¶ 2    Plaintiff Congregation Beth Tefillah (CBT) brought a claim against the estate of William Harris Smith, decedent, to enforce two pledges William allegedly had made to donate funds to CBT. Defendant Zachary Smith, who is William's son and the independent administrator of his estate, objected to CBT's claims. After a bench trial, the circuit court ultimately allowed CBT's claims for the two pledges.

¶ 3    On appeal, defendant Smith argues that the circuit court erroneously (1) allowed CBT's three witnesses to testify in violation of either the Dead-Man's Act (735 ILCS 5/8-201 (West 2020)), or witness disclosure rules, and (2) allowed CBT's claim arising from an alleged oral charitable pledge that was not supported by either detrimental reliance or consideration.

¶ 4    For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 5                                    I. BACKGROUND

¶ 6    William Harris Smith died on June 18, 2016, leaving his wife Ilene Smith and defendant as his heirs at law. William's will was admitted for probate in July 2016. Thereafter, the independent executor of the estate filed a notice of disallowance of CBT's $1 million claim.

¶ 7    In February 2017, CBT filed two claims against the estate. The first claim of $650,000 was for an outstanding balance relating to a $1 million pledge William purportedly made to CBT for its building fund. The second claim of $60,000 was for a pledge William purportedly made to fund CBT's ambassadors program, which was intended to bring young men from Israel to CBT to teach, work and study. The estate objected to both claims.

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 8    In April 2018, the court revoked the independent executor's letters and appointed defendant Smith as independent administrator with the will annexed.

¶ 9    Defendant moved the court for summary judgment, arguing that CBT could not prove its claims because the Dead-Man's Act barred the testimony of CBT's key witnesses: Bruce Goldman, Rabbi Pinchas Allouche and Art Paikowsky. The court denied defendant's motion, ruling that the Dead-Man's Act did not apply because Goldman and Rabbi Allouche were not adverse parties and Paikowsky was not directly interested in the action. The court also ruled that a question of fact existed regarding whether CBT could enforce its agreement with William under either a breach of contract or promissory estoppel theory.

¶ 10    Later, defendant moved *in limine* to bar the testimony of Goldman and Rabbi Allouche based on the Dead-Man's Act. Defendant also moved to bar the testimony of decedent's widow, Ilene, arguing that CBT failed to disclose her as a witness in response to defendant's Rule 213(f) interrogatories, as required by Illinois Supreme Court Rule 213 (eff. Jan. 1, 2018). The trial court denied defendant's motions.

¶ 11    The bench trial began on September 24, 2019, and the court heard evidence over three days. The testimony of Goldman, Rabbi Allouche, Ilene and defendant, and the admitted documents established the following facts.

¶ 12    William was a prolific Chicago real estate developer and lived part time in Paradise Valley, Arizona. He met Rabbi Allouche in 2010, and they developed a close relationship. Rabbi Allouche is the founder of CBT, a non-profit Jewish congregation founded in 2010. Initially, CBT operated out of Rabbi Allouche's guest house, later moved to a strip mall storefront, and in 2018 moved to the newly constructed building at issue in this appeal.

¶ 13 At some point after 2010, Rabbi Allouche introduced William and Goldman, and they became involved in the planning and fundraising for CBT's new building around 2013 or 2014. They were volunteers on the new building committee together, with Goldman serving as the chairman. The initial budget for the building according to the marketing materials was $5,750,000.

¶ 14 On August 5, 2015, Rabbi Allouche, Goldman and Paikowsky, a hired fundraiser, traveled to Chicago to solicit William for a substantial donation to the building fund. At this meeting, William agreed to donate $500,000, which matched Goldman's $500,000 pledge. On August 6, 2015, Paikowsky emailed Goldman a revised budget of $6,365,000. Shortly thereafter, William spoke with Ilene and decided to increase his pledge to $1 million. William's pledge would be used for general purposes. William urged Goldman to increase his pledge, and Goldman raised his pledge to $1 million. Their pledges had the effect of influencing other congregants to make substantial donations to CBT's building fund.

¶ 15 On August 9, 2015, Goldman and Paikowsky exchanged emails reflecting confusion about what William had actually pledged. There was no follow-up to these emails. In August or September of 2015, William paid $350,000 of his $1 million pledge to CBT. Rabbi Allouche relied on William's financial contributions to purchase the land and his expertise to construct the building.

¶ 16 On or about September 21, 2015, CBT purchased land in Scottsdale, Arizona for the building. CBT purchased the land for $870,000 in cash and did not take out a mortgage for the real estate sale. CBT used William's $350,000 donation as part of the funds to purchase the land. After the purchase, William's pledge balance was $650,000.

¶ 17    William's real estate company was Smithfield Construction. William and his employees assisted CBT in designing every aspect of CBT's new building. William cared very deeply about the new building and, according to CBT's board of director minutes, worked "super hard" on the project. Smithfield Construction's gratuitous contributions to the project totaled $150,313.72.

¶ 18    On February 16, 2016, Goldman sent an email to an administrative assistant at CBT and several others involved in the fundraising for the new building. In this email, Goldman reported the status of the pledges and stated that he and William had each pledged $1 million to CBT for the building fund.

¶ 19    CBT maintained informal internal spreadsheets that tracked pledges. These spreadsheets reflected a $1 million pledge by William and Ilene. However, Goldman testified at trial that these spreadsheets were not accurate. Ilene testified that the $1 million pledge was William's pledge alone, they kept their assets separate, and they did not have sufficient marital assets to cover the pledge.

¶ 20    On May 24, 2016, Rabbi Allouche and William had a telephone conversation during which William agreed to fund the entire ambassadors program, which cost $60,000. William sent Rabbi Allouche an email the next day confirming his commitment to fund the entire ambassadors program. However, William died on June 8, 2016, prior to paying for the program.

¶ 21    Rabbi Allouche testified initially in his deposition that CBT did not bring anyone from Israel as part of the ambassadors program. However, at trial, he clarified that two young men did in fact come from Israel as part of the program. Furthermore, defendant admitted that he believed William intended to fund the ambassadors program.

¶ 22    On March 2, 2017, Ilene made a pledge for $250,000 after consultation with Rabbi Allouche, who did not ask her to contribute money toward William's alleged $1 million pledge.

¶ 23    CBT did not introduce evidence of any signed or unsigned pledge card from William, letter or email to or from William confirming the $1 million pledge, or notes from any of the conversations in which William purportedly pledged $1 million. The only evidence produced was contemporaneous accounts of conversations between Goldman, Rabbi Allouche and William, CBT's internal emails and spreadsheets, and William's $350,000 donation.

¶ 24    One year passed between William's death and CBT's groundbreaking for the new building in July 2017. CBT was aware of the estate's February 2017 objection to CBT's building fund and ambassadors program claims when CBT broke ground. The exterior walls of the building were built in late 2017 or early 2018. CBT ultimately spent over $7.5 million on the building, which was $1.7 million more than the budget presented in the marketing materials and over $1.1 million more than the revised budget. CBT did not take out a construction loan and was able to raise the entire $7.5 million from pledges.

¶ 25    The building has been open for services since November 2018. The sanctuary and banquet hall can hold 240 congregants; the holy ark in the sanctuary is made of carved wood, and the mikveh contains walls of tile and stone, a tiled shower, and a marble bathtub and flooring. The mikveh is named in honor of Goldman for his $1.1 million contribution. Nothing in the building is named after William.

¶ 26    CBT claims they still need funding to complete the memorial garden, playground and basketball court and purchase additional furniture and signage. CBT was not able to fund any of the $500,000 endowment or purchase its preferred air-conditioning system. Neither the memorial

garden, playground nor basketball court were identified in the fundraising materials. The endowment was listed in the fundraising materials as part of the initial $5,750,000 budget.

¶ 27    On November 15, 2019, the court issued a decision allowing CBT's $60,000 claim for the ambassadors program but denying CBT's $650,000 claim for the building fund. Regarding the ambassadors program claim, the court found that sufficient evidence established the existence of a promise and CBT's detrimental reliance on that promise because CBT brought two young men from Israel to study and work at CBT pursuant to William's pledge. The court concluded that the $60,000 pledge was enforceable.

¶ 28    Regarding the building fund claim, the court found that sufficient evidence established the existence of William's $1 million promise, but CBT did not meet its burden to show detrimental reliance or consideration for that promise. Regarding detrimental reliance, the court found that CBT was able to build, furnish and use the building without ever taking out a loan. Moreover, CBT spent $1.1 million more than its highest budget. Furthermore, the estate objected to the claim in February 2017 and CBT broke ground five months later in July 2017 and proceeded with the project. Regarding consideration, the court found that no testimony or exhibits showed that William received any consideration.

¶ 29    Accordingly, the court awarded CBT $60,000 for the ambassadors program claim and denied the balance of $650,000 for the building fund claim.

¶ 30    CBT moved the court to reconsider its decision, arguing *inter alia* that the court erred in applying Illinois law when it concluded that William had not received consideration for his pledge. Specifically, CBT argued that William's promise was converted into a valid and enforceable contract before the promise was withdrawn because CBT relied on William's pledge and the

promises of others when CBT spent money to buy the land for the building project in September 2015.

¶ 31 In response, defendant argued, *inter alia*, that the court had properly analyzed the detrimental reliance and consideration issues.

¶ 32 On June 11, 2020, the court granted CBT's motion to reconsider, and agreed with CBT's argument that William's $1 million pledge was supported by consideration, citing *Thompson v. Board of Supervisors of Mercer County*, 40 Ill. 379, 383 (1866), which stated the well-established rule that where advances have been made or expenses or liabilities incurred by others in consequence of a voluntary subscription[2] before any notice of withdrawal, this should on general principles be deemed sufficient consideration to make the voluntary subscription binding. The court reiterated its decision allowing CBT's $60,000 claim for the ambassadors program. The court also allowed CBT's claim for the $650,000 balance for the building fund claim, finding that although CBT did not demonstrate detrimental reliance on William's $1 million pledge, CBT showed adequate consideration for William's pledge when it purchased the land in September 2015.

¶ 33 Defendant timely appealed.

¶ 34                                    II. ANALYSIS

¶ 35 On appeal, defendant Smith argues that the circuit court erroneously (1) allowed CBT's witnesses Goldman and Rabbi Allouche to testify in violation of the Dead-Man's Act, and Ilene to testify despite CBT's failure to disclose her as a witness in response to defendant's Rule 213(f)

---

[2] A subscription is "[a]n oral or a written agreement to contribute a sum of money or property, gratuitously or with consideration, to a specific person or for a specific purpose." Black's Law Dictionary (7th ed. 1999).

interrogatories, and (2) allowed CBT's $650,000 building fund claim despite the lack of consideration or detrimental reliance that rendered William's $1 million oral pledge unenforceable.

¶ 36                                    A. CBT's Witnesses

¶ 37    First, defendant argues that the trial court erred by allowing Goldman and Rabbi Allouche to testify at the bench trial because the Dead-Man's Act barred their testimony. According to defendant, Goldman and Rabbi Allouche were acting as the equivalent of adverse parties under the Dead-Man's Act because they controlled the litigation.

¶ 38    A trial court's decision to admit or exclude evidence will not be reversed absent an abuse of discretion. *Kim v. Mercedes-Benz, U.S.A., Inc.*, 353 Ill. App. 3d 444, 452 (2004). "An abuse of discretion may be found only where no reasonable man would take the view adopted by the circuit court." *Id.*

¶ 39    The Dead-Man's Act provides, in pertinent part:

> "In the trial of any action in which any party sues or defends as the representative of a
> deceased person *** *no adverse party or person directly interested in the action* shall be
> allowed to testify on his or her own behalf to any conversation with the deceased *** or to
> any event which took place in the presence of the deceased ***." 735 ILCS 5/8-201 (West
> 2020).

¶ 40    The purpose of the Dead-Man's Act is to protect the decedent's estate from fraudulent claims. *General Auto Service Station, LLC v. Garrett*, 2016 IL App (1st) 151924, ¶ 20. The Dead-Man's Act "is intended to remove the temptation of a survivor to testify to matters that cannot be rebutted because of the death of the only other party to the conversation or witness to the event,

but it is not intended to disadvantage the living." *Balma v. Henry*, 404 Ill. App. 3d 233, 238 (2010). Under the Dead-Man's Act, a "directly interested witness is one whose interest in the judgment is such that a pecuniary gain or loss would come to him or her directly as the immediate result of the judgment." *Bernardi v. Chicago Steel Container Corp.*, 187 Ill. App. 3d 1010, 1017 (1989). A "party" under the Dead-Man's Act is one who has a right to control the proceedings, pursue a defense, call and cross-examine witnesses, and appeal from the decision. *Garrett*, 2016 IL App (1st) 151924, ¶ 21.

¶ 41    In applying the Dead-Man's Act, this court has not disqualified witnesses who were agents of an adverse party even though they were vital actors in the event in question. See *id.* (vice president and lawyer of the plaintiff company, who had no equity or ownership interest in the plaintiff company, could submit an affidavit about a copy of a lease being true and accurate where the defendant, the other party to the lease, had died); *Sankey v. Interstate Dispatch, Inc.*, 339 Ill. App. 420, 425-26 (1950) (where plaintiff's decedent was killed in a collision involving a truck owned by the defendant corporation, the truck driver, who was the defendant's employee and a named party but was not served with process and had not filed an appearance, was not a party for purposes of the Dead-Man's Act and was properly permitted to testify); *Cf. Nardi v. Kamerman*, 196 Ill. App. 3d 591, 600 (1990) ("where a corporation will gain or lose as a result of a suit, corporate shareholders are [directly interested persons and thus] incompetent to testify against the representative of a deceased person"); *Hall v. Humphrey-Lake Corp.*, 29 Ill. App. 3d 956, 961 (1975) (the defendant vice president, who was a shareholder, was an adverse party barred from testifying regarding the decedent's rejection of an oral contract). See also *Adams v. First Methodist Episcopal Church*, 251 Ill. 268, 271 (1911) (where the decedent's will left most of her property to

her church, and her son likened the church to a corporation and its members to shareholders and argued that the church members should be barred from testifying about the decedent's competency based on their interest in the lawsuit, the court rejected the son's argument, stating that the connection of members with a church is purely voluntary and they have no personal or private interest in the church's property).

¶ 42     Here, CBT is the plaintiff in this action; Goldman, a volunteer, and Rabbi Allouche, an employee of CBT, were not named parties in this litigation, were not served with process and did not file an appearance. CBT is a non-profit religious congregation governed by its board of directors, to which Goldman and Rabbi Allouche reported and of which neither was a member. Unlike CBT's board, Goldman and Rabbi Allouche did not have the authority to pursue the claim on behalf of CBT or appeal from the decision. Although Goldman worked closely with CBT's counsel during this litigation, and both Goldman and Rabbi Allouche had first-hand knowledge of the events in question, signed pleadings on behalf of CBT, and were representatives of CBT, they did not control the litigation and remain non-parties to this litigation. We conclude that the trial court did not err by finding that the Dead-Man's Act did not bar Goldman and Rabbi Allouche from testifying.

¶ 43     Next, defendant argues that the trial court should have barred Ilene's testimony because CBT failed to disclose her as a witness pursuant to Supreme Court Rule 213(f) (eff. Jan. 1, 2018), which requires a party to "furnish the identities and addresses of witnesses who will testify at trial" and, for lay witnesses, to "identify the subjects on which the witness will testify." Defendant argues that as a result of CBT's failure to disclose Ilene in response to defendant's Rule 213(f) interrogatories, defendant did not depose her and her testimony at trial was an unfair surprise.

¶ 44 Rule 213 is designed to give those involved in the trial process a degree of certainty and predictability that furthers the administration of justice and eliminates trial by "ambush." Ill. S. Ct. R. 213 (eff. Jan. 1, 2018); *Copeland v. Stebco Products Corp.*, 316 Ill. App. 3d 932, 946 (2000). Rule 219(c) authorizes a trial court to impose a sanction, including barring a witness from testifying, upon any party who unreasonably refuses to comply with any provisions of the court's discovery rules or any order entered pursuant to these rules. Ill. S. Ct. R. 219(c) (eff. July 1, 2002); *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112, 120 (1998). The decision to impose a particular sanction under Rule 219(c) is within the discretion of the trial court and, thus, only a clear abuse of discretion justifies reversal. *Boatman's National Bank v. Martin*, 155 Ill. 2d 305, 314 (1993).

¶ 45 A just order of sanctions under Rule 219(c) is one which, to the degree possible, insures both discovery and a trial on the merits. *Wakefield v. Sears, Roebuck & Co.*, 228 Ill. App. 3d 220, 226 (1992). When imposing sanctions, the court's purpose is to coerce compliance with discovery rules and orders, not to punish the dilatory party. *Sander v. Dow Chemical Co.*, 166 Ill. 2d 48, 62 (1995). A trial court is empowered to fashion a sanction, but is limited by the caveat that the rule is to be liberally construed to do substantial justice between the parties. Ill. S. Ct. R. 213(k) (eff. Jan. 1, 2018). This rule is intended as a shield to prevent unfair surprise but not a sword to prevent the admission of relevant evidence on the basis of technicalities. Ill. S. Ct. R. 213(k) (Committee Comments (March 28, 2002)).

¶ 46 The factors a trial court should consider in determining what sanction, if any, to apply include (1) the surprise to the adverse party, (2) the prejudicial effect of the proffered testimony or evidence, (3) the nature of the testimony or evidence, (4) the diligence of the adverse party in

seeking discovery, (5) the timeliness of the adverse party's objection to the testimony or evidence, and (6) the good faith of the party offering the testimony or evidence. *Boatmen's National Bank*, 155 Ill. 2d at 314. Of these factors, no single factor is determinative. *In re Estate of Kline*, 245 Ill. App. 3d 413, 433 (1993). A court must consider the unique factual situation that each case presents and then apply the appropriate criteria to these facts in order to determine what particular sanction, if any, should be imposed. *Boatmen's National Bank*, 155 Ill. 2d at 314.

¶ 47    CBT identified Ilene as a person with knowledge elsewhere within its answers to defendant's interrogatories. Twelve days prior to trial and in accordance with the trial court's orders, CBT filed and served defendant with its trial witness list, identifying defendant, Goldman, Rabbi Allouche, Paikowsky and Ilene as witnesses that CBT might call to testify at trial. That same day, defendant moved *in limine* to bar all of CBT's witnesses. The trial court denied defendant's motion as to Goldman, Rabbi Allouche and Paikowsky because defendant had previously deposed each of them. Regarding Ilene, the trial court, after reviewing the parties' briefs on the issue and hearing argument, determined that exclusion was not warranted and instead limited her testimony to the extent of her knowledge as set forth in CBT's responses to defendant's first and second sets of interrogatories as someone with knowledge about William's $1 million pledge to CBT.

¶ 48    Ilene was William's widow and no stranger to this litigation. Her limited testimony about her knowledge of William's $1 million pledge was consistent with Goldman's and Rabbi Allouche's testimony and was neither a surprise nor prejudicial to defendant. We conclude that the trial court's decision to allow Ilene to testify in a limited fashion was not an abuse of discretion.

¶ 49                               B. Charitable Pledge

¶ 50    Defendant argues that William's $1 million pledge was gratuitous and unenforceable because CBT failed to establish any consideration or detrimental reliance to enable CBT to enforce the pledge under a theory of either contract or promissory estoppel. Defendant argues that the trial court's decision to the contrary "conflated [the concepts of] consideration and detrimental reliance and apparently found both where there was neither." Defendant argues that (1) CBT provided no basis for the trial court to reconsider its prior ruling denying CBT's building fund claim, (2) cases from other jurisdictions that considered nearly identical factual scenarios declined to enforce similar charitable subscriptions and public policy supports that outcome, (3) CBT did not show that William received consideration for his pledge or that CBT relied on that pledge to its detriment because CBT entered a contract to purchase the land, which contract provided for specific performance, almost a year before William's alleged pledge, and (4) CBT did not provide clear proof of detrimental reliance where the synagogue was built at a budget well over its original projection without the need to take on any debt.

¶ 51    The question of whether there is consideration for an agreement is a question of law, which we review *de novo*. *Abrams v. Awotin*, 388 Ill. 42 (1944); *In re Marriage of Tabassum & Younis*, 377 Ill. App. 3d 761, 770 (2007); see also *Hassebrock v. Deep Rock Energy Corp.*, 2015 IL App (5th) 140105, ¶ 56 (under *de novo* review, the reviewing court conducts the same analysis the trial judge would perform and does not defer to the trial judge's conclusions or rationale). However, to the extent a trial court's decision to allow or deny a claim against an estate turns on the court's findings of fact, then we will reverse that decision only if those findings are against the manifest weight of the evidence. *In re Estate of Bozarth*, 2014 IL App (4th) 130309, ¶ 31; see also *Snelson*

*v. Kamm*, 204 Ill. 2d 1, 35 (2003) (a finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or where a decision is unreasonable, arbitrary, and not based on any evidence).

¶ 52    First, we reject defendant's claim that the trial court erred by reviewing CBT's motion to reconsider the court's November 2019 decision that denied CBT's $650,000 claim. Contrary to defendant's argument on appeal, CBT properly moved for reconsideration on the basis that the trial court misapplied the existing law in rendering its decision. See *Hachem v. Chicago Title Insurance Co.*, 2015 IL App (1st) 143188, ¶ 34 (one purpose of a motion to reconsider is to bring to the trial court's attention an error in the trial court's previous application of existing law).

¶ 53    Next, we find defendant's reliance on caselaw from other jurisdictions unavailing given the existence of well-established relevant law in Illinois. In *Pryor v. Cain*, 25 Ill. 292, 295 (1861), the defendant had made a promise to donate money for the building of a church, and the court found that when other donors relied on the defendant's promise, he was "bound in good faith to fulfill the obligation, the party paying the money or furnishing the labor and materials having a right to rely on such subscription." See also *Thompson*, 40 Ill. at 384 (1866) (the rule seems well established that "[w]here advances have been made or expenses or liabilities incurred by others in consequence of such subscriptions before any notice of withdrawal, this should, on general principles, be deemed sufficient to make them obligatory, provided the advances were authorized by a fair and reasonable dependence on the subscriptions").

¶ 54    Accordingly, under the rule in Illinois,

    "[i]t is generally considered that a promise to donate money to a charitable purpose

    is gratuitous and unenforceable unless consideration therefore exists; however, the original

gratuitous promise will be converted into a valid and enforceable contract, where before a withdrawal of the promise, and in reliance thereon, as well as on the promises of others, the charitable organization to which the promise was made, expends money and incurs enforceable liabilities in furtherance of the enterprise the donors intended to promote.

\*\*\*

[I]f the promisee on the faith of the subscription, and before its withdrawal, performs some act such as the expenditure of money or incurring liabilities which are enforce[a]ble, in furtherance of the enterprise the promisor intended to assist or promote, consideration for the subscription is then supplied, and the same is thereafter deemed to be valid, binding and enforce[a]ble."

Courts lean toward sustaining such contracts when the same may be done without violating established rules of law." *In re Drain's Estate*, 311 Ill. App. 481, 483-84 (1941).

¶ 55 The trial court found that William pledged $1 million of his own assets to CBT's building fund and paid CBT $350,000 of that pledge, William's and Goldman's $1 million pledges influenced other donors to make substantial donations to CBT's building fund, and the real estate closing documents established that CBT did not purchase the property until September 2015, approximately one month after William made his $1 million pledge and after he gave CBT $350,000 of that pledge to purchase the land. Based on our review of the record, we conclude that the trial court's findings are not against the manifest weight of the evidence.

¶ 56 We also conclude that William's gratuitous promise to donate $1 million to CBT's building fund became a valid and enforceable contract because CBT, before the promise was withdrawn, and in reliance on William's promise as well as the pledges it inspired other donors to make, used

William's $350,000 paid portion of his $1 million promise to buy the land and build the synagogue in Scottsdale, Arizona. Accordingly, in conformance with Illinois law, consideration for William's promise to donate $1 million was supplied and his promise was thereafter deemed to be valid, binding and enforceable.

¶ 57    Defendant's assertion that William's pledge was not enforceable because CBT signed a real estate contract to purchase the land before William made his pledge is not persuasive. The obligations or expenses undertaken when one enters a real estate contract are not identical to the obligations or expenses undertaken when the land is actually purchased at the real estate closing. Furthermore, consideration was also supplied when William challenged Goldman to increase his pledge from $500,000 to $1 million, which induced other donors to make pledges. See *In re Estate of Wheeler*, 284 Ill. App. 132, 146 (1936) (pledges made specifically in consideration of other pledges where, relying thereon, the promisee has made expenditures, constitute sufficient consideration for those pledges). Finally, we do not address defendant's argument that CBT did not establish detrimental reliance because CBT did not appeal the trial court's decision in favor of defendant that CBT failed to establish detrimental reliance.

¶ 58                                     III. CONCLUSION

¶ 59    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 60    Affirmed.